JOHNSON FISTEL, LLP
Frank J. Johnson (SBN 174882)
frankj@johnsonfistel.com
Phong L. Tran (SBN 204961)
phong@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Lead Counsel for Plaintiffs*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE RH SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Lead Case No.: 4:18-cv-02452-YGR<br><br>(Consolidated with: 4:18-cv-3930-YGR)<br><br>**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>Hon. Yvonne Gonzales Rogers<br><br>DEMAND FOR JURY TRIAL |

By and through their undersigned counsel, Plaintiffs David Magnani ("Magnani") and Hosrof Izmirliyan ("Izmirliyan" and together with Magnani, "Plaintiffs") bring this shareholder derivative action on behalf of Nominal Defendant RH Inc. ("RH" or the "Company"), and against certain current and former officers and directors of the Company for issuing false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling.  Plaintiffs make these allegations upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by RH and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on RH's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *In Re RH, Inc. Securities Litigation*, Case No. 4:17-00554-YGR (N.D. Cal.) (the "Securities Class Action"); and (e) review of other publicly available information concerning RH and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.     This stockholder derivative action concerns the harm caused to RH by the Company's Board of Directors (the "Board") and certain of its senior officers, due to their role in issuing a series of false and misleading statements concerning the launch of RH's new, highly-anticipated product line, "RH Modern," and the inventory needed to support the launch of the line.  From at least March 26, 2015 to the present (the "Relevant Period"), the Individual Defendants committed violations of the federal securities law and breached their fiduciary duties owed to RH and its stockholders by, *inter alia*, making, approving, certifying, and permitting improper statements about those critical business concerns in the Company's public filings and proxy statements, as well as in communications and presentations with analysts and investors. By and through the Individual Defendants' violations of law, RH has sustained and will continue

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1  to sustain damages, including more than a billion dollars in losses to the Company's market

2  capitalization, as well as significant harm to its reputation, goodwill, and standing in the business

3  community.  Moreover, the Individual Defendants' wrongdoing has exposed the Company to

4  millions of dollars in potential liability from the Securities Class Action, and the significant costs

5  incurred (and to be incurred) in connection with the litigation and potential resolution of that

6  action.

7         2.     Headquartered in Corte Madera, California, RH is a luxury home furnishings

8  retailer that operates through numerous retail galleries and outlet stores throughout North

9  America.  Customers may also purchase products from RH through the Company's e-commerce

10  website and highly-produced, glossy sales catalogs known as "Source Books."

11         3.     Prior to and continuing through the Relevant Period, RH did not manufacture its

12  own products and merchandise, but rather contracted with third-party manufacturers, or

13  "vendors," for its production needs.  Because most of RH's vendors were located overseas in

14  Asia, the process for planning, ordering, manufacturing, and delivering the Company's products

15  (including RH Modern products) involved substantial lead times.  RH acknowledged that "typical

16  product lead times [were] 3-9 months," and that the Company was "require[d] . . . [to] provide

17  vendors with significant ordering lead time."

18         4.     In prior years, RH had experienced surging revenue growth, but heading into the

19  Relevant Period, the Company's growth was slowing down, in large part, due to a significant

20  decrease in the sales of existing product lines.  To kickstart its stagnating growth, the Individual

21  Defendants planned the launch of a totally new line of products, known as RH Modern, which

22  the Company's senior management touted as "the most innovative and new concept in the world

23  of home design" that "represented our finest work to date."  The RH Modern line encompassed a

24  broad range of home furnishings and accessories, including dining sets, couches and sectionals,

25  bedroom sets, shelving and cabinets, lighting, and other upscale home décor and products.

26         5.     In order to successfully launch RH Modern (and, in turn, reinvigorate the

27  Company's earnings growth), it was critical that the Company maintained adequate in-stock

28  inventory of RH Modern products.  The failure to maintain sufficient inventory would be

disastrous for the product launch, as it would cause delays in fulfilling customer orders for RH Modern products, or even worse, the cancellation of product orders.  During the Relevant Period, RH was faced with this very nightmare scenario, as the Company's management failed to give sufficient lead time to its overseas vendors to manufacture and deliver RH Modern products in advance of the launch.  The poor planning by RH management left the Company with a severe and debilitating inventory shortage.

6.      Rather than disclose that the Company was facing a severe shortage of RH Modern merchandise, the Individual Defendants conveyed to the market that the Company was sufficiently "growing" its inventory levels to fulfill product orders and support the launch of RH Modern in 2015.  For example, during a conference call with investors and analysts on March 26, 2015, when the launch of RH Modern was announced, Defendant Gary Friedman ("Friedman"), RH's long-time Chief Executive Officer ("CEO") and Board Chairman, represented that the Company was "systematically placing orders now," which "should help us with lead times [and] help us with inventory flow."  A few months later, during a June 11, 2015 investor conference call, Defendant Friedman claimed that RH was growing its inventory levels, making "additional" inventory investments, and that the Company would "compete on speed" for the delivery of RH Modern products.

7.      RH's senior management repeated this refrain over and over again.  Also, during the March 26, 2015 investor conference call, Defendant Karen Boone ("Boone"), RH's Chief Financial and Administrative Officer and President, stated that RH was making the necessary inventory investments to prevent "high back orders."  Later, during a June 11, 2015 investor conference call, Defendant Boone claimed that the Company would "grow inventory ahead of sales at the end of Q4."  And, as part of a video presentation for investors published on the Company's website that same day, Boone represented that inventory for the first quarter of 2015 "was up 24%," and that "we expect to end the year with inventory growth that is higher than our sales growth given the inventory investments in RH Modern and other newness that we will introduce this fall."

8.      The Individual Defendants continued to foster the same false and misleading message that RH was well-equipped to support the launch of RH Modern and fulfill orders for RH Modern products, through the latter part of 2015 and continuing into 2016.  On September 10, 2015, the Individual Defendants caused RH to issue a press release, which reported that "the launch of RH Modern and RH Teen late in the third quarter," among other factors, "puts us on a clear path to accelerate our growth in the fourth quarter and into fiscal 2016."  The Individual Defendants authorized another press release on December 10, 2015, indicating that the Company's management was "extremely encouraged by the early results we are seeing out of . . . RH Modern," and that "RH Modern is trending to add significant incremental revenues . . . ."  That same day, RH held an investor call during which Defendant Friedman touted as a "headline" that RH Modern was "performing ahead of our expectations."

9.      However, while the Individual Defendants continued to put a positive spin on the launch of RH Modern and its purported impact on the Company's revenue growth, the market ultimately got wind of distressing news about the product line's less-than-robust inventory levels.  During the December 10, 2015 investor call, Defendant Friedman revealed that RH Modern was suffering from an "in stock position [which is] not great today."  Following Friedman's announcement regarding RH Modern's weak inventory position, the price of RH stock dropped the next two trading days by over 10%, from $87.59 to $78.65.  Nevertheless, the Individual Defendants persisted in presenting the false picture that the launch of RH Modern was a critical success, and that the Company was continually growing its inventory levels to fully support the product launch.

10.     A few months later, the Individual Defendants were forced to disclose additional adverse information concerning RH Modern and its inadequate inventory levels.   On February 24, 2016, the Individual Defendants caused RH to publish a press release, reporting the Company's preliminary fourth quarter and full fiscal year 2015 financial results.  According to the press release, the Company had a disastrous fourth quarter, as reported earnings per share and net income were well below guidance for that quarter.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

11.     In a letter that accompanied the February 24, 2016 press release, Defendant Friedman acknowledged that a "key factor" having a "negative effect on our fourth quarter results" was that "[w]hile the initial response to RH Modern has been outstanding, we are experiencing shipping delays as certain vendors are struggling to ramp up production of this new product line." Friedman further admitted that "the poor in-stocks . . . suppressed orders," and that "RH Modern revenues [are] being affected in the first half by the production issues mentioned earlier . . . ." However, Friedman attempted to shift blame for the Company's poor financial performance to various "macro economic challenges" including "energy, oil, or currency fluctuations" in certain markets. Following this shocking announcement, the price of RH stock plummeted by more than 25% the next day, from $51.92 to $38.49 per share, erasing over $543 million in the Company's market capitalization.

12.     Months later, on June 8, 2016, the Company released even more bad news concerning RH Modern. Along with reporting disappointing financial results for the first quarter of fiscal year 2016, the Company revealed that it had been forced to spend $18 million on "customer accommodations and related expenses, largely as a result of RH Modern production delays." It was further reported that other product lines were suffering from "extra inventory" that was "bloating [the] balance sheet." Following this adverse news, the price of RH stock plummeted over 21% on June 9, 2016, and then dropped another 6.5% the next day.

13.     As discussed herein, the Individual Defendants' false and misleading statements (and other wrongdoing, such as the failure to implement, maintain, or follow adequate internal controls) caused RH stock to trade at artificially inflated levels during the Relevant Period. But when the revelations concerning RH Modern's poorly-planned launch and inadequate inventory levels seeped into the market, the Company's stock was hammered by massive sales, driving down the share price from its artificially inflated highs, erasing more than a billion dollars of the Company's market capitalization.

14.     As a result of the Individual Defendants' malfeasance, which caused the improper reporting and dissemination of false and misleading information, an aggrieved shareholder filed the Securities Class Action on February 2, 2017. On February 26, 2018, the Honorable Yvonne

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Gonzalez Rogers, United States District Court Judge of the Northern District of California, issued an order in the Securities Class Action, denying defendants' motion to dismiss in its entirety and holding that plaintiffs in that case had satisfied the heightened pleading standards of Fed. R. Civ. Proc. 9(b), and the Private Securities Litigation Reform Act ("PLSRA"). Accordingly, RH and certain of its officers and directors continue to be exposed to substantial liability for their violations of the federal securities law.

15.     The Individual Defendants' misconduct does not end there. During the Relevant Period, RH's Board authorized the filing of proxy statements with the SEC, which urged the Company's stockholders to vote for the re-election of certain directors and approve certain executive compensation proposals, among other proposals. In seeking stockholder votes in accord with the Board's recommendations, the proxy statements misrepresented and/or omitted material information concerning, among other things: (i) the failures of the Board and certain of its Committees to fulfill their duties, including with respect to the oversight of internal control over financial reporting and disclosure controls and procedures; (ii) that the Company's management had misrepresented the success of the launch of RH Modern; (iii) that the Company's management had failed to order and maintain adequate inventory to support the launch; (iv) that the Company had been forced to spend millions of dollars in customer accommodations as a result of the product delays; and (v) that the Board-approved compensation programs encouraged the non-disclosure and inadequate reporting of material information. Had RH stockholders known the truth about these material concerns at the time of their vote, they would not have voted to reelect the faithless fiduciaries that failed to exercise proper oversight over the Company and would not have voted in favor of the executive compensation proposals.

16.     Furthermore, while the Company's stock price was artificially inflated, certain of the officers and directors of RH exploited their positions as corporate fiduciaries of the Company and, with knowledge of material, adverse, and non-public information regarding the Company's operations and business prospects, sold their personal stock holdings for tens of millions of dollars in insider profits. Specifically, Defendants Boone and Carlos Alberini, a long-time RH Director,

took advantage of the artificially inflated prices to sell their RH shares for proceeds totaling ***more than $34 million*** during the Relevant Period.

17.    RH's Board has not, and will not, commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to RH for authorizing or failing to correct the false and misleading statements alleged herein, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred.  Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Thus, Plaintiffs rightfully bring this action to vindicate RH's rights against its wayward fiduciaries and hold them responsible for the damages they have caused RH.

## JURISDICTION AND VENUE

18.    Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.    The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

20.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a) because: (i) RH maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to RH, occurred in this District; and (iv) Defendants have received substantial

1   compensation in this District by doing business here and engaging in numerous activities that had

2   an effect in this District.

3         21.    In connection with the acts and conduct alleged herein, Defendants, directly and

4   indirectly, used the means and instrumentalities of interstate commerce, including but not limited

5   to, the United States mail, interstate telephone communications, and the facilities of the national

6   securities exchanges and markets.

7                       **INTRADISTRICT ASSIGNMENT**

8         22.    A substantial portion of the transactions and wrongdoings which give rise to the

9   claims in this action occurred in the County of Alameda, and as such, this action is properly

10   assigned to the Oakland division of this Court.

11                          **THE PARTIES**

12   **Plaintiffs**

13         23.    Plaintiff David Magnani is a current shareholder of RH and has continuously held

14   stock in the Company since March 2015.

15         24.    Plaintiff Hosrof Izmirliyan is a current shareholder of RH and has held RH stock

16   since February 2015.

17   **Nominal Defendant**

18         25.    Nominal Defendant RH is a Delaware corporation with its principal executive

19   offices located at 15 Koch Road, Corte Madera, California  94925.  RH is traded on the New York

20   Stock Exchange ("NYSE") under the ticker symbol "RH," and has more than 21 million shares

21   outstanding as of March 23, 2018.

22   **Individual Defendants**

23         26.    Defendant Gary Friedman ("Friedman") is, and was during the Relevant Period,

24   RH's CEO and Chairman of the Board.  From October 2012 to July 2013, Friedman served as the

25   Chairman Emeritus, Creator and Curator of the Company.  From June 2010 to October 2012,

26   Friedman served as the Company's Chairman and Co-Chief Executive Officer, and from

27   March 2001 to June 2010, was the Company's CEO.  Friedman was also a member of RH's Board

28   from March 2001 to August 2012 and later rejoined in July 2013.   Friedman received

1   $1,682,921.00 in compensation from RH in 2015; $1,286,100.00 in compensation from RH

2   in 2016; and $26,564,470 in compensation from RH in 2017.  Friedman is a named defendant in

3   the Securities Class Action.

4       27.    Defendant Karen Boone ("Boone") served as RH's Chief Financial and

5   Administrative Officer, and Co-President during the Relevant Period, until she stepped down

6   from those roles and resigned from RH on August 14, 2018.  As RH's Chief Financial and

7   Administrative Officer, Boone was responsible for the Company's financial and administrative

8   functions, including strategic and financial planning, accounting, treasury, tax, internal audit,

9   human resources, investor relations, legal, compliance, and facilities across the Company's

10  businesses and brand.  Boone served as RH's Chief Financial and Administrative Officer and Co-

11  President from May 2016 to November 2017, Chief Financial and Administrative Officer from

12  May 2014 to May 2016, and Chief Financial Officer from June 2012 to May 2014.   Boone

13  received $1,948,669.00 in compensation from RH in 2015; $4,416,550.00 in compensation from

14  RH in 2016; and $1,082,259 in compensation from RH in 2017.  Boone is a named defendant in

15  the Securities Class Action.

16      28.    Defendant Carlos Alberini ("Alberini") is a RH Director and has been since

17  June 2012.  Alberini previously served as the Company's Co-Chief Executive Officer, along with

18  Defendant Friedman, from June 2010 through October 2012 and from July 2013 through January

19  2014.  As stated on the Company's corporate website, Alberini "was selected to join Restoration

20  Hardware's Board of Directors because of his expertise and experience in retail and

21  merchandising, branded consumer goods, accounting, financing and capital finance, board

22  practices of other large retail companies and leadership of complex organizations."   Alberini

23  received $243,159.00 in compensation from RH in 2016 and $271,965.00 in compensation from

24  RH in 2017.

25      29.    Defendant Keith Belling ("Belling") is a RH Director and has been since

26  April 2016.  Prior to his appointment to the Board, Belling served as an advisor to the Board since

27  May 2015.  As stated on the Company's corporate website, Belling "has been selected to our

28  board because of his experience as a founder, leader, and entrepreneur of several innovative

consumer companies, as well as his background and experience in the real estate sector." Belling received $265,170.00 in compensation from RH in 2016 and $271,965.00 in compensation from RH in 2017.

30.     Defendant Eri Chaya ("Chaya") is a RH Director and has been since November 2012.  Chaya also serves as the Company's Chief Creative Officer and Co-President. Chaya previously served as the Company's Vice President of Creative from July 2006 to April 2008.  As stated on the Company's corporate website, Chaya was "selected to our board of directors because she possesses particular knowledge and experience in product development, marketing, advertising and design."   Chaya received $2,061,269 in compensation from RH in 2015; $4,516,550 in compensation from RH in 2016; and $1,227,359.00 in compensation from RH in 2017.

31.     Defendant Mark Demilio ("Demilio") is RH's Lead Independent Director and has served as a Director since September 2009.  During the Relevant Period, Demilio served as the Chairperson of the Audit Committee and was also a member of the Compensation Committee and Nominating and Corporate Governance Committee.   Demilio received $332,063.00 in compensation from RH in 2015; $351,986.00 in compensation from RH in 2016; and $366,965.00 in compensation from RH in 2017.

32.     Defendant Katie Mitic ("Mitic") is a RH Director and has been since October 2013.   During the Relevant Period, Mitic was a member of the Audit Committee, beginning in October 2013.   As stated on the Company's corporate website, Mitic was "selected to our board of directors because of her extensive experience as a leader and entrepreneur obtained from her experience with major global consumer-facing technology companies."  Mitic received $282,063.00 in compensation from RH in 2015; $286,670.00 in compensation from RH in 2016; and $296,965.00 in compensation from RH in 2017.

33.     Defendant Ali Rowghani ("Rowghani") is a RH Director and has been since January 2015.   During the Relevant Period, Rowghani was a member of the Company's Nominating and Corporate Governance Committee, beginning in January 2015.  As stated on the Company's corporate website, Rowghani's "operational and financial leadership, coupled with

10

his expertise in scaling innovative, high-growth companies, provides the board with valuable operational and financial expertise." Rowghani received $277,063.00 in compensation from RH in 2015; $243,920.00 in compensation from RH in 2016; and $286,965.00 in compensation from RH in 2017.

34.     Defendant Leonard Schlesinger ("Schlesinger") is a RH Director and has been since April 2014.  During the Relevant Period, Schlesinger served as the Chair of the Compensation Committee, beginning in April 2014.  According to the Company's corporate website, Schlesinger's "extensive experience at numerous private and public retail companies provides the board with valuable operational, financial and business expertise."  Schlesinger received $297,063.00 in compensation from RH in 2015; $301,670.00 in compensation from RH in 2016; and $306,965.00 in compensation from RH in 2017.

35.     Defendants Friedman, Boone, Alberini, Belling, Chaya, Demilio, Mitic, Rowghani, and Schlesinger are sometimes referred to herein as the "Individual Defendants."

36.     Defendants Friedman, Alberini, Belling, Chaya, Demilio, Mitic, Rowghani, and Schlesinger are sometimes referred to herein as the "Director Defendants."

37.     Defendants Demilio and Mitic are sometimes referred to herein as the "Audit Committee Defendants."

38.     Defendants Boone and Alberini are sometimes referred to herein as the "Insider Selling Defendants."

**Non-Party Directors**

39.     Hillary Krane ("Krane") is not a defendant in this action.  Krane was appointed to RH's Board in June 2016 and currently serves as a Director.  Krane is also a member of the Audit Committee.  Krane received $224,469.00 in compensation from RH in 2016.

### SUBSTANTIVE ALLEGATIONS

**Background to the Relevant Period**

40.     RH, which was previously known as Restoration Hardware Holdings, Inc., was formed in August 2011 and completed its initial public offering in November 2012.  RH is a leading luxury furnishings retailer with multiple channels of distribution, including 83 retail

"Galleries" and 32 outlet stores in North America, an e-commerce website, and Source Books, which are highly-produced, voluminous sales catalogs from which customers may place orders for RH products.  The Company sells a wide-range of home furnishings and accessories, including furniture, lighting, textiles, bathware, décor, outdoor and garden, tableware, and child and teen furnishings.

41.     RH's Source Books are a unique and essential part of the Company's business model.  As detailed in the Company's Annual Report on Form 10-K for fiscal year ended 2016 ("FY 2016 10-K"), filed with the SEC on March 30, 2016, the Company's Source Books were used to "showcase nearly our entire product assortment," and were "one of our primary branding and advertising vehicles."  These Source Books, which were distributed to existing and potential customers, were "a key driver of sales through both [RH's] websites and retail stores," which "increased sales across all of [RH's] channels.

42.     Prior to, and during the Relevant Period, RH did not manufacture its own products and merchandise, but rather contracted with third-party vendors, most of whom were overseas, for its production and manufacturing needs.  As stated in the Company's FY 2016 10-K, "approximately 82% of [RH's] products were sourced in Asia, the majority of which originated from China, 11% from the United States and the remainder from other regions."  Due to its heavy reliance on Asian and overseas vendors, the Company required significant lead times for the planning, ordering, manufacturing, and delivery of its products.  Indeed, RH acknowledged in the FY 2016 10-K that "typical product lead times [were] 3-9 months," and that the Company was "require[d] . . . [to] provide vendors with significant ordering lead time."

43.     RH had experienced significant revenue growth in prior years, but heading into the Relevant Period, the Company's growth was slowing down, in large part, due to a decrease in the sales of existing product lines.  Indeed, while the Company reported comparable brand revenue growth of 31% for fiscal year ending February 1, 2014, it declined to 20% for the year ending January 31, 2015.  For that same period, the Company's in-store sales growth rate was declining, even though the Company's overall retail space continued to increase.

44. To kickstart its stagnating growth, the Individual Defendants planned the launch of a new "game-changer" line of products, known as RH Modern, which according to Defendant Friedman, was "core to RH" and would open an "entirely new market[]" for the Company. RH Modern was supposedly the Company's "most innovative and new concept in the world of home design," encompassing a broad range of home furnishings and accessories, including dining sets, couches and sectionals, bedroom sets, shelving and cabinets, lighting, and other upscale décor and products. However, the successful launch of RH Modern would require the Company to maintain adequate in-stock merchandise from that line to fully accommodate customer demand. Without the adequate inventory, customers who ordered RH Modern products would face long delays to receive their products, leading to cancelled orders, and costly accommodates from the Company to appease dissatisfied customers.

45. In March 2015, the Individual Defendants caused the Company to announce that this new product line would be ready to launch by the fall of that year. Given the significant lead times required for the roll-out of the product launch, the Company needed to order RH Modern products from its overseas vendors by March 2015 at the latest (approximately six months before the fall launch) in order to have sufficient inventory to support the launch. However, RH's management poorly planned the launch and failed to give the Company's vendors sufficient lead time to manufacture and deliver RH Modern products in advance of the launch, leaving the Company with a major inventory shortage. The Company therefore had little stock of RH Modern products to sell at the time of the launch, even though the product line was touted as the "game-changer" that would bolster the Company's growth. The lack of sufficient inventory for RH Modern would prove to be disastrous for the Company, as it caused extended delays in fulfilling customer orders for RH Modern products and the outright cancellation of orders, resulting in widespread customer dissatisfaction.

46. Rather than inform the public that the Company was facing a severe and debilitating shortage of RH Modern merchandise at the time of the planned launch (or alternatively, taking affirmative steps to delay the launch altogether, so that the inventory issues could be remediated), the Individual Defendants conveyed to the market that the Company had

sufficient inventory to satisfy customer demand and fulfill product orders to support the launch of the line in the fall of 2015 and continuing through the next year.  The Individual Defendants' decision not to provide meaningful and truthful information concerning the lack of sufficient inventory for RH Modern was intended to mask the Company's overwhelming lack of readiness to launch and support the product line.

**The Individual Defendants Disseminated and/or Caused the Company to Disseminate False and Misleading Statements During the Relevant Period**

47.     On March 26, 2015, the start of the Relevant Period, the Individual Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the fourth quarter ("Q4") and full fiscal year ended January 31, 2015 ("FY 2014").  RH reported revenues for Q4 FY 2014 had increased 24% to $582.7 million, from $471.7 million in Q4 FY 2013; comparable brand revenue had increased 24% on top of a 24% increase for the same period last year; and direct revenues had increased 33% to $304.8 million.  For its full year-end results, RH reported that net revenues for FY 2014 had increased over 20% to $1.867 billion from $1.551 billion in FY 2013; comparable brand revenue had increased 20% on top of a 31% increase for the same period last year; and direct revenues had increased 28% to $934.2 million.  The Company also provided guidance for the first quarter of fiscal year 2015 with net revenues in the range of $415 million to $420 million, as well as guidance for fiscal year ending January 30, 2016, with net revenues in the range of $2.13 billion to $2.17 billion.

48.     In conjunction with the March 26, 2015 press release, the Individual Defendants also caused the Company to post a video presentation and host an investor conference call to announce the launch of the Company's new RH Modern line.  While the Company's management did not refer to RH Modern specifically by name at that time, management stated that the Company would be launching two new "core" businesses in the latter half of the year, which would open up "entirely new markets" and "are significantly incremental to what we're doing today."  One of these core businesses would later be revealed as RH Modern, which Defendant Friedman described during the investor call as being a "game-changer" that "represents our finest

1  work ever, and might represent one of the biggest market potentials that we've addressed with a

2  new category, a new business."

3       49.    After the announcement of the new product line, securities analysts were

4  interested and inquired about the Company's inventory levels.  Specifically, during the

5  March 26, 2015 investor call, an analyst from Cowen and Company asked about "the inventory

6  needs over the next year," how the "supply chain . . . intersect[s] with the customer experience,"

7  and how investors should "think about the magnitude of cash outflows" for inventory purchases.

8  Defendant Boone represented that "the business does require a night-in-stock position . . . [s]o we

9  will continue to make inventory investments to make sure that . . . [we] improve our in-stocks and

10  make sure we're not having high back orders."  When the analyst asked "[w]here are you with

11  lead times roughly," Defendant Friedman responded that the Company was "making more

12  meaningful investments, system investments on both sides, with our vendors and internally here,"

13  which "should help us with lead times, help us with inventory flow, the way we're systematically

14  placing orders now."

15       50.    The foregoing statements concerning RH's inventory were false and misleading

16  because the Company had not systematically placed orders for RH Modern products (set to launch

17  in the fall of 2015) and were not making the required inventory investments to support that

18  product launch.

19       51.    The next day, on March 27, 2015, the Individual Defendants caused RH to file

20  with the SEC its Annual Report on Form 10-K for fiscal year ended January 31, 2015 (the "FY

21  2014 10-K").  The FY 2014 10-K was signed by Defendants Friedman, Boone, Alberini, Chaya,

22  Demilio, and Mitic.  According to the FY 2014 10-K, RH had "improved [its] supply chain and

23  fulfillment capabilities, and ha[d] built a scalable infrastructure with significant capacity to

24  support [its] future growth."  The 10-K also stated that RH's "enhanced supply chain and

25  fulfillment operations allow [it] to manage customer orders and distribute merchandise to stores

26  and customers in an efficient and cost-effective manner."  The 10-K noted that "these upgrades

27  ha[d] improved customer satisfaction by reducing delivery times, reducing damage to

28  merchandise, and improving [the] customer's overall buying experience."

52.     The FY 2014 10-K also featured a section titled "Product Development," which described RH's "proprietary product development platform," through which the Company purportedly "streamlined [its] product development organization and process to shorten product lead times[.]"  The 10-K represented: "Key aspects of our product development platform are . . . Organization . . . Process . . . [and] . . . Facility."  The 10-K further explained that "[a]s a result of [this] proprietary [platform], [the Company's] typical product lead times are 3-9 months, which enhances [RH's] ability to introduce more new products with each collection."  The 10-K also provided the RH's "Consolidated Balance Sheets," which reported the Company's merchandise inventories of approximately $559 million, up from $453 million at the end of fiscal year 2014.

53.     Notably, the FY 2014 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2001 ("SOX") signed by Defendant Friedman, in his capacity as Board Chairman and CEO, and Defendant Boone, in her capacity as Chief Financial and Administrative Officer. The SOX certification stated that the FY 2014 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "the information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods presented therein."  Defendants Friedman and Boone each signed a separate certification stating, in relevant part:

1.     I have reviewed this Annual Report on Form 10-K of Restoration Hardware Holdings, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

54.      The foregoing statements in the FY 2014 10-K were false and misleading because despite the Company's purported "enhanced" supply chain operation and proprietary product development platform, the Company's management had poorly planned the launch of RH Modern and did not order the necessary inventory in time to support the launch of the line.

55.      On June 11, 2015, the Individual Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the first quarter ("Q1") of fiscal year 2015 ("FY 2015"), ending May 2, 2015.  The Company reported that net revenues for the quarter had increased 15% to

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

$422.4 million, from $366.3 million in Q1 FY 2014; comparable brand revenue growth was 15% in the quarter on top of 18% for the same period last year; and direct revenues had increased 18% to $207.7 million in the quarter.  The Company also provided guidance for the second quarter of FY 2015, with net revenues for that quarter in the range of $495 million to $505 million, and increased guidance for fiscal year ending January 30, 2015, with full-year net revenues increased to the range of $2.146 billion to $2.176 billion.

56.    That same day, June 11, 2015, the Individual Defendants also caused RH to publish a video presentation on the Company's website, which formally introduced the RH Modern line.  Defendant Friedman stated in the video presentation that "[w]e are excited to unveil today what we believe is the most innovative and new concept in the world of home design, and represents our finest work to date."  Friedman further stated that RH Modern would launch in the fall of 2015 and explained that that the new line would transform its retail business:

> RH Modern launches this fall with a 300-page source book, a dedicated website, and a significant retail presence, including a freestanding RH Modern store at our former gallery on Beverly Blvd in Los Angeles, the entire ground floor of our Flatiron gallery in New York City, plus entire floors of our next generation Design Galleries in Atlanta, and opening later this year in Chicago, Denver, Tampa and Austin.

> *       *       *

> Later this year, 20 of our largest legacy stores will be designed to include 2,000 to 3,000 square feet dedicated to RH Modern. In total, RH Modern will have over 120,000 square feet of selling space in its first year of operation. Looking forward, with RH Modern occupying up to 15,000 square feet in our future next generation design galleries and the possibility for additional freestanding locations, RH Modern will have a retail footprint that grows by up to 100,000 square feet per year and will be a disruptive force in the highly fragmented modern market.

57.    Friedman also stated that the Company would "support the launch of RH Modern with a national advertising campaign in the top design and luxury publications such as Architectural Digest, Elle Decor, Town & Country, and Wallpaper, as well as key online marketing, and opening events in Los Angeles, and New York."  According to Friedman, RH Modern "can create a significant and new market, much larger than at any time in history."

58.    During the June 11, 2015 video presentation, Defendant Boone provided specific assurances that the Company was sufficiently growing the inventory of RH Modern to support

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

the launch, noting that "[i]nventory at the end of the first quarter was up 24%, and we expect to end the year with inventory growth that is higher than our sales growth given the inventory investments in RH Modern and other newness that we will introduce this fall."

59.     Also, on June 11, 2015, the Individual Defendants caused the Company to host a conference call with investors and analysts, again to hype the launch of RH Modern.  During the investor call, a Deutsche Bank analyst asked whether RH's vendors "have the capacity to handle" the RH Modern launch, and how the launch of RH Modern would affect the Company's "balance sheet through inventory."  Defendant Boone responded that "because we have a lot of the newness and investment that are coming in the back half" of the year, "we will grow inventory ahead of sales at the end of Q4."  And, in response to a question from an analyst from Piper Jaffray & Co., regarding "the elevation of inventory because of the newness," Boone stated that "[i]t will grow a little bit in Q2 . . . and then we'll make some additional investments in the Modern and other newness that we are having.  It will grow a little bit more in Q2 then it will dip, and then it will grow a little bit more in Q4."  Defendant Friedman provided further assurances that the Company's vendors would be able to support the launch of RH Modern, explaining "most of [RH] Modern is scaling on our current vendor base with some new vendors added in some categories."

60.     Also, during the June 11, 2015 investor call, an analyst from Raymond James asked about RH Modern's "supply chain," to which Defendant Boone responded that "this summer," the Company was opening 1.5 million square feet of distribution center space "planned partially for Modern" and "knowing that Modern was coming . . . we should be very good on supply chain capacity for a while."  Boone also stated that in negotiating payment terms with manufacturers, "most importantly, again, is making sure we have the product to get to the customer."  Furthermore, a Wells Fargo Securities analyst inquired about the "speed to delivery" for RH Modern products, asking "[h]ow do you think you'll compete on speed?"  Defendant Friedman responded that "[on] the Modern side, and the lead times, the wait times are a real disadvantage for the people in the marketplace today" but that "[w]e are going to compete on speed just like we would our current business," and that RH would have "a huge competitive advantage versus how the marketplace exists and operates today."  Friedman went on to say,

19

1  "we're being relatively conservative on inventory that's how and where we are buying" and that

2  "we're going to oversell some stuff – overbuy, underbuy and so our lead times and our delivery

3  won't be optimized in the 6 months or 12 months.  After that, I think, you think about it, it's going

4  to be a huge competitive advantage versus how the marketplace exists and operates today."

5        61.    Friedman also responded to comments from a Wolfe Research analyst, stating:

6  "we expect this to really open up the aperture of the brand to attract a lot of new customers and

7  in many ways we expect RH Modern to create a new business in general," and characterized

8  RH Modern as an "incremental layer of business," "a new market," and "an entirely new

9  business" that would create "incremental revenues and profitability" for RH.  Friedman stated

10  confidently: "could RH Modern, in and of itself, take $4 billion to $5 billion [of revenues] up?

11  Yes, it could."  He further proclaimed, "I am more excited about this than any new thing we've

12  ever done and I would say our organization is, too."

13        62.    The foregoing statements concerning the Company's purported inventory for

14  RH Modern were false and misleading as the Company had not ordered the necessary inventory

15  for RH Modern and had failed to make the necessary inventory investments to support the launch

16  of the line.

17        63.    On June 15, 2015, RH announced its intention to offer up to $300 million in

18  convertible notes, "to provide . . . additional funding for expansion of its business and they might

19  represent one of the biggest market potentials that we've addressed with a new category, a new

20  business."

21        64.    On September 10, 2015, the Individual Defendants caused the Company to issue

22  a press release and file a current report on Form 8-K with the SEC announcing the Company's

23  financial and operating results for the second quarter ("Q2") of FY 2015.  The Company reported

24  that net revenues for the Q2 FY 2015 had increased 17% to $506.9 million from $433.8 million

25  in Q2 FY 2014.  The Company also provided guidance for the following quarters as follows:

26  (i) for the third quarter of FY 2015, net revenues in the range of $531 million to $541 million,

27  adjusted net income in the range of $25.5 million to $27.5 million, and adjusted diluted EPS in

28  the range of $0.60 to $0.65; and (ii) for the fourth quarter of FY 2015, net revenues in the range

of $698 million to $708 million, adjusted net income in the range of $58.3 million to $60.4 million, and adjusted diluted EPS in the range of $1.37 to $1.42.   Additionally, the Company raised overall guidance for fiscal year ending January 30, 2015, with full-year net revenues increased to the range of $2.158 billion to $2.178 billion, adjusted net income increased to range of $129.6 million to $133.7 million, and adjusted diluted EPS increased to range of $3.06 to $3.16.

65.   In the September 10, 2015 press release, Defendant Friedman provided a very positive near-term outlook for the Company, specifically highlighting the launch of RH Modern and how it would significantly contribute to the accelerated growth of the Company.   Friedman stated:

> We believe that the sheer scope of what we are about to unveil over the course of just three months – September through November - illustrates our execution capabilities, our unmatched level of innovation, and the power of our multi-channel platform.   We will be launching two significant new businesses, RH Modern and RH Teen - each with their own Source Book, website, and a significant retail presence.   Also during this period, we have four, revolutionary next generation Design Galleries opening in Chicago, Denver, Tampa and Austin, as well as a standalone RH Modern gallery in Los Angeles, and RH Baby & Child galleries in West Palm Beach and Greenwich.   We believe that the launch of RH Modern and RH Teen late in the third quarter, coupled with the new next generation Design Galleries opening in October and November, puts us on a clear path to accelerate our growth in the fourth quarter and into fiscal 2016.
>
> *          *          *
>
> We have proven our ability to execute and deliver profitable growth during this period of unprecedented innovation of our product offer and retail store experience. Since our initial public offering in 2012, our adjusted operating margins have expanded 470 basis points - from 5.8% to our guidance of at least 10.5% this year.   We believe our growth is even more notable considering the significant investments we are making to develop the many new businesses we have in the pipeline and the infrastructure we are putting in place to scale them.

66.   Also, on September 10, 2015, the Individual Defendants caused the Company to publish a video presentation on its corporate website for investors and analysts.   During the video presentation, Defendant Friedman continued to promote RH Modern, stating: "it is the most comprehensive launch of a new business and brand in the history of our industry."   Additionally, during the video presentation, Defendant Boone touted the inventory growth for RH Modern, stating that "[i]nventory at the end of the second quarter was up 29%," and highlighting how the

21

Company's management "expect[s] to end the year with inventory growth that is higher than our sales growth given the inventory investments necessary for the launches of RH Modern and RH Teen."

67.     The Individual Defendants further caused the Company to host a conference call for investors and analysts later that day.  During the investor call, an analyst from Telsey Advisory Group asked that of the Company's reported inventory growth of 29% in Q2 2015, "how much of that is related to [RH] Modern . . . ?"  Defendant Boone responded that for RH Modern, "some of it's on the water" (meaning the products had been ordered and were shipping from overseas), and that "we do expect inventory, as I mentioned on the video, to outpace revenue growth, just because we do need to make those investments in [RH] Modern . . . inventory."

68.     Additionally, during the September 10, 2015 investor call, a Goldman Sachs analyst inquired about the Company's "operation and execution."  In response, Defendant Friedman provided assurances about the launch of the new business, stating: "I know it looks like we are going so much faster, and it's true and we are," but that at RH, "we test and prove and scale new businesses here on a regular basis every season and every year since we have been a public Company.  We have hit our numbers every year and every quarter.  We do what we tell you we are going to do."

69.     Defendant Friedman further dismissed the notion that the launch of RH Modern was risking, stating: "Now you'd say like well gosh, is that really risky?  Well, I don't know; I'd look at everything else we have done."  Friedman emphasized that RH Modern "is the most important new business we have launched in the history of this Company," and "the most important and significant new home furnishings business to be launched in the last 15 or 20 years."  Friedman further explained that RH could "go so fast" with the RH Modern launch because "we know this business," noting: "It is every category that we're already in.  It is every product line that we're already in.  We know the percent of the business that should be living room, dining room, bedroom, bathroom.  We know how sizes sell versus other sizes.  We know how finishes sell versus other finishes.  We know the lighting business.  We know the window

1    treatment business. We know the rug business. We know the bedroom and bathroom textiles

2    business."

3         70.    The foregoing statements were false and misleading as the Company's

4    management had failed to order adequate inventory for RH Modern and had failed to make the

5    necessary inventory investments to support the launch of the line.

6         71.    On October 7, 2015, the Individual Defendants caused the Company to issue a

7    press release announcing the opening of RH Chicago, which reportedly was a "first-of-its-kind

8    retail concept" that featured the "first in-store presentation" of RH Modern products for sale.

9    RH Modern was reportedly presented in an 11,000-square-foot exhibition space located on the

10   fourth level of the gallery.  Also, around this time, RH Modern was launched on the Company's

11   website.

12        72.    On October 12, 2015, the Individual Defendants caused the Company to issue a

13   press release entitled "RH Introduces RH Modern."  The press release stated that "RH announced

14   today the unveiling of RH Modern" with a 540-page Source Book and website.  The press release

15   stated that RH Modern "debuts with a unique website and significant physical presence, including

16   a dramatic, standalone RH Modern Gallery at the site of RH's former gallery on Beverly

17   Boulevard in Los Angeles, the entire ground floor of the Flatiron Gallery in New York, plus entire

18   floors in the Company's next generation Design Galleries in Chicago, Denver, Tampa and

19   Austin."

20        73.    As a result of the foregoing false and misleading statements and omissions that

21   were issued and/or authorized by the Individual Defendants, shares of RH stock traded at

22   artificially inflated during the Relevant Period.

23                              **THE TRUTH EMERGES**

24        74.    On December 10, 2015, the Individual Defendants caused the Company to issue

25   a press release and file a current report on Form 8-K with the SEC announcing the Company's

26   financial and operating results for the third quarter ("Q3") of FY 2015.  RH reported net revenue

27   for Q3 to be $532.5 million, which was at the lower end of guidance.  The same day, the Individual

28   Defendants also caused the Company to publish a video presentation on its corporate website,

1 | during which Defendant Boone blamed the Company's disappointing results, in large part, on the

2 | late release of the RH Modern Source Book, "which were not in home[s] until mid-November

3 | versus our original expectation of mid-October."   Boone also attributed the disappointing

4 | financial results on "various external macro factors outside our control, including deteriorating

5 | trends in regions impacted by currency and oil prices."

6 |     75.   The Individual Defendants also caused the Company to host a conference call

7 | with investors and analysts later that day, during which Defendant Friedman revealed that

8 | inventory levels for RH Modern were subpar.  Friedman explained that RH Modern's "in-stock

9 | position is not great today," and "it's not that we were in [stock] and then we were out [of stock],

10 | it's really just a build of getting some of those most initial products."

11 |     76.   The market responded negatively to the news of RH Modern's weak inventory

12 | levels, resulting in a significant sell-off of RH stock.  RH's share price declined by $3.78 per

13 | share on December 11, 2015, and fell another $5.16 the next trading day on December 14, 2015,

14 | erasing over $361 in the Company's market capitalization on those two trading days alone.

15 |     77.   The Individual Defendants, however, continued to provide reassurances about the

16 | purported success of the launch of RH Modern.  During the December 10, 2015 video

17 | presentation, the Individual Defendants failed to disclose the severity of RH Modern in-stock

18 | problems, but instead continued to portray the line's inventory levels in a very positive light,

19 | stating that "inventory at the end of the third quarter was up 25% year-over-year.  And we

20 | continue to expect to end the year with inventory growth higher than our sales growth given the

21 | inventory investments in RH Modern and RH Teen."

22 |     78.   Indeed, Defendant Friedman continued to hype the launch of RH Modern during

23 | the video presentation, stating "that RH Modern was launched with a 540-page source book, its

24 | own dedicated website, a significant retail presence inside our Next Generation galleries, plus a

25 | free-standing gallery on Beverly Boulevard in Los Angeles."  Touting the purported success of

26 | the RH Modern launch, Friedman stated that "the trends are very encouraging.  In the retail

27 | locations where RH Modern is now featured, we have early data that RH Modern is adding more

28 | than 40 points of incremental volume.  In Los Angeles where we opened our first free-standing

1  location, RH Modern is trending to add over 60 points of incremental volume with a $25 million

2  annual run rate, while our Melrose gallery continues to comp positive only a few blocks away."

3        79.    And, later during the investor call that day, Defendant Boone again sought to

4  alleviate concerns about RH Modern's inventory levels, stating: "we have been talking about the

5  cadence of inventory for the year, and really, nothing's changed.  We continue to expect to have

6  year-over- year inventory growth ahead of sales growth in Q4, mostly because of the cadence of

7  newness."  Boone further asserted that "[t]he investments we have made in our supply chain and

8  systems infrastructure will enable us to continue to improve our customer experience and support

9  our long term growth."

10       80.    During the December 10, 2015 investor call, Defendant Friedman was asked by

11  an analyst from Bank of America – Merrill Lynch whether "out of stocks in Modern" would be

12  "a gating factor to the early success of Modern."  Friedman pointedly responded that "*[w]e've got*

13  *a lot of new product,*" and "in stocks are going to improve every week."  Rather than disclose

14  that the Company had failed to grow RH Modern inventory to adequately support the launch,

15  Friedman inaccurately spun the issue as RH Modern products merely being subject to high

16  customer demand, stating: "the best sellers in a new business are always going to sell out, and

17  you're going to always have to respond and catch up with those," and noting "the demand is

18  outstanding."  Friedman further added that "[t]he early data would tell us that [RH Modern is]

19  opening up an entirely new market, it's bringing in new customers, and it's accretive to our current

20  core customers," without mentioning the substantial customer complaints and cancellations the

21  Company was receiving due to its inability to ship RH Modern products on a timely basis.

22       81.    Also, on December 10, 2015, the Individual Defendants caused the Company to

23  raise guidance for net revenues for the fourth quarter of fiscal year 2015, ending January 31, 2016

24  (Q4 FY 2015).  The Company increased guidance for Q4 FY 2105 net revenues to the range of

25  $708 million to $718 million.  During the December 10, 2015 investor call, an analyst from UBS

26  asked, "what's given you the confidence in Q4 to increase your revenue guidance range, even

27  despite all the factors you named, like the oil and the later Source Book?"  Defendant Friedman

28  confidently responded that "*[a]s of today we are ahead of Q4. That's why.*"  Friedman explained

1  that as of December 10, 2015, RH already had revenue of more than $708 million for Q4 FY 2015.

2  Friedman further represented that "we have a lot of data that we're looking at," and "I feel more

3  confident than ever before."  Defendant Friedman also indicated that the Company had already

4  accounted for certain macro trends in the Company's guidance, stating that "[i]t's about basically

5  the same as it dragged in the third quarter," and "[w]e have a good read so far how we're trending

6  versus the third quarter, so far, four or five weeks in."

7        82.    Additionally, on December 10, 2015, the Individual Defendants authorized the

8  Company to file with the SEC a quarterly report on Form 10-Q with the SEC, which again

9  described RH Modern's inventory in positive terms, while failing to disclose how inadequate the

10  product line's inventory levels were.  According to the Q3 10-Q, there had been "increases in

11  inventory of $201.7 million related to the increase in 2015 Spring, RH Teen and RH Modern

12  collections."

13        83.    The Q3 10-Q contained certifications, signed by Defendants Friedman and

14  Boone, that were similar to the certifications described in ¶52, attesting to the accuracy and

15  completeness of the financial report.

16        84.    On February 24, 2016, the Individual Defendants caused the Company to issue a

17  press release containing a letter from Defendant Friedman reporting preliminary fourth quarter

18  and full fiscal year 2015 results.  The Company suffered a disastrous fourth quarter, as its financial

19  results included adjusted diluted EPS of $0.99 and adjusted net income of only $41.8 million –

20  figures that were close to 30% below the lower end of the range that the Individual Defendants

21  had previously set in December 2015, six weeks into the quarter.  The quarterly EPS and adjusted

22  net income figures were also each below the Company's results for the fourth quarter of the prior

23  fiscal year 2014.  Despite Defendant Friedman's representation in December 2015 that RH's then-

24  revenue was already ahead of $708 million, the Company announced net revenues of

25  $647.2 million for the ***entire fourth quarter***, as well as overall results for full fiscal year 2015

26  that were substantially below the range in each major financial metric: net revenues, adjusted net

27  income, adjusted diluted EPS, and adjusted operating margins.

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

85.     In his February 24, 2016 letter, Defendant Friedman explained that "there is certainly a fair amount of bad news in the quarter," and a "key factor" contributing to the "negative effect on our fourth quarter results" was that "[w]hile the initial response to RH Modern has been outstanding, we are experiencing shipping delays as certain vendors are struggling to ramp up production of this new product line."  Friedman further acknowledged that "the poor in-stocks . . . suppressed orders," and "we do not plan to introduce any incremental new businesses in fiscal 2016, as we believe launching into a potential headwind creates asymmetrical risk to the downside."  Friedman also stated that "RH Modern revenues [are] being affected in the first half by the production issues mentioned earlier," and "[o]ur energies in the first half [of 2016] will be focused on ramping production and improving in-stocks for RH Modern."  While Friedman acknowledged RH Modern's inventory problems and its adverse impact on the Company's financial results, Friedman blamed the inventory problems on "struggling" vendors, rather than the Company's failure to place timely orders for inventory to support the product launch.  Furthermore, Friedman wrongly continued to blame "macro economic challenges" for RH's performance, citing the purported impact of "energy, oil, or currency fluctuations" on certain markets for RH products and asserting that "we are clearly operating in different market conditions than a year ago."  Friedman also blamed the stock market, stating that "increased volatility in the U.S. stock markets" hurt RH sales.

86.     On the heels of this bad news, the price of RH stock plummeted.  On February 25, 2016, the day after Friedman's letter, RH's stock price fell $13.43 to close at $38.49 per share, which was more than a 25% drop that erased over $543 million of the Company's market capitalization.  As Bloomberg reported, this was the "biggest single-day drop [in Company share price] since the retailer held its initial public offering in 2012."

87.     On February 25, 2016, Bloomberg published an article entitled "Delight the Customer or LOSE YOUR JOB: Restoration Hardware CEO Sends Scorching Memo." According to the Bloomberg article, Defendant Friedman had circulated a scathing memo to RH employees in late January 2016, comparing the Company's operations to a burning building and threatening to fire those who did not raise their commitment to customer service.  Friedman's

email, which was sent after a meeting with executives and vendors concerning customer service issues and late deliveries, was aggressive in tone and was marked with dramatic, all-capitalized words.  Among Friedman's incendiary statements in his memo:

- "We were sitting there discussing how the building caught on fire, why the building caught on fire, how long we expected the building to continue burning, NO ONE WAS FOCUSED ON THE PEOPLE IN THE BUILDING WHO WERE ON FIRE. THEIR CLOTHES BURNING, AND MANY OF THEM DYING. WE HAVE LET CUSTOMERS DIE."

- "WE CANNOT AFFORD TO LOSE ONE SINGLE CUSTOMER. NOT ONE. YOU WILL NEVER GET IN TROUBLE FOR MAKING A DECISION TO DELIGHT OUR CUSTOMERS. YOU WILL, HOWEVER, LOSE YOUR JOB IF YOU DON'T."

- "We need a MASSIVE CHANGE IN OUR CULTURE AND ATTITUDE RIGHT NOW.  THE GOAL IS DELIGHT."

88.     The next day, the Washington Post picked up the Bloomberg story and noted that "Friedman may have reason to send a hair-on-fire, light-their-fire memo to workers about putting customer delight…first," in light of the fact that the Company "fourth quarter sales and earnings were well below forecasts[.]"

89.     On March 29, 2016, the Individual Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the fourth quarter ("Q4") and for full fiscal year 2015.  The Company reported that net revenues for the quarter had only increased 11%, which represented "a shortfall to our plan."  Defendant Friedman stated in the release that a "key" factor contributing to "a negative effect on our fourth quarter results" was the "shipping delays" the Company was experiencing, "as certain vendors are struggling to ramp up production of this new product line [referring to RH Modern]."

90.     Also, on March 29, 2016, the Individual Defendants caused the Company to release a video presentation to investors and analysts.  During the video presentation, Defendant

Friedman continued to blame the RH Modern shipping delays on "certain vendors [who] are struggling to ramp up production."  Friedman continued to tout the launch of RH Modern, stating that the line "can quickly become a billion-dollar-plus brand," and that RH was "ramping production and improving in-stocks for RH Modern."  Defendant Boone further chimed that "[r]evenue growth in the front half of fiscal 2016 will be driven by . . . RH Modern as the 2015 orders turn into delivered revenue; as well as stronger overall Modern demand as our in-stock levels improve."

91.    During the video presentation, RH's senior management also acknowledged that the Company was spending considerable sums of money to appease unhappy and unsatisfied customers who were experiencing delays in the shipment of their RH Modern products.  Defendant Boone stated RH was "investing approximately $8 million to $10 million during the first quarter due to higher cancellation rates, shipping delays, and our overall initiative to elevate the customer experience."  The Company's "investments in the customer experience" amounted to a significant expense of "$0.12 to $0.15 per share" for the first quarter of 2016.  Moreover, according to the March 29, 2016 press release, the "customer accommodations due to RH Modern production delays" were "expected to be an approximate $15 million reduction in net revenues and $0.22 reduction in adjusted diluted EPS in fiscal 2016."

92.    The Individual Defendants also caused the Company to host an investor conference call on March 29, 2016.  During the call, a Goldman Sachs analyst inquired about the Company's first quarter guidance.  Defendant Friedman responded that RH's guidance was "rightly conservative."  When the analyst followed-up and asked about the "cadence of the business as you saw it play out through the quarter and perhaps into Q1," Friedman responded that with respect to RH Modern, "[w]e're currently in the 70% range as far as our in stocks today, and we expect that to build to the mid-80%s by the end of the quarter which is more at a normalized level."  Friedman later reiterated that "[t]he in stocks in Modern are going up."  Analysts covering RH construed Friedman's comments as acknowledgment that inventory RH Modern was still at low and inadequate levels, and that the Company was still pushing to grow its in-stock position of the line.

93.     On June 8, 2016, the Individual Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the first quarter ("Q1") of fiscal year 2016.  The bad news continued to mount for the Company, as it disclosed disappointing financial results for the quarter.  Defendant Friedman stated in the press release that "RH Modern production delays and investments to elevate the customer experience" had adversely impacted the Company's earnings:

> Our near term business performance is being pressured by the continued headwinds in the markets impacted by energy and currency, as well as a general slowdown in the luxury consumer market.  In addition, the costs associated with RH Modern production delays and investments to elevate the customer experience, the timing of recognizing membership revenues related to the transition from a promotional to a membership model, and a more aggressive approach to rationalizing our SKU count to optimize inventory, are expected to negatively impact our fiscal 2016 adjusted diluted EPS outlook by approximately $0.90 to $1.00.

94.     In the video presentation released the same day, Defendant Boone admitted that RH had been forced to spend $18 million on "customer accommodations and related expenses, largely as a result of RH Modern production delays," which was almost double the "$8 million to $10 million" range that she had claimed the Company had invested in such accommodations in the prior quarter.  And, while the Company had provided guidance of net income in the range of $1.6 million to $2.5 million and earnings between $0.04 and $0.06 per share for the quarter, the Company reported a net loss of $2.1 million and a loss of $0.05 per share.  Moreover, based on the "RH Modern production delays," the Company reduced its guidance for the full fiscal 2016 year.

95.     Also, in the June 8, 2016 video presentation, Defendant Friedman blamed the Company's recent "misfortunes" on "the launch of RH Modern," which "has suffered difficulties ramping production."  Defendant Boone further stated that RH would be taking a "more aggressive approach to rationalizing our SKU count and optimizing inventory," which meant that the Company would be liquidating unnecessary or excess inventory from RH's product lines other than RH Modern.  During the investor conference call held the same day, Defendant Friedman explained that the Company had "extra inventory" of non-RH Modern products that was "bloating [the] balance sheet."

96.     The market reacted swiftly and negatively to this shocking news.   On June 9, 2016, the day after the announcement, the price of RH shares plummeted more than 21% from $36.07 to $28.41.  The share price of RH dropped another 6.5% the next – resulting in a massive two-day drop that erased over $311 million in market capitalization.

97.     Investment analysts were shocked by the June 9, 2016 disclosures and were particularly critical of the credibility of RH's management.  For example, on June 9, 2016, BB&T Capital Markets published a report stating that "the last two quarters' debacles cast significant doubt on management's credibility," and that "we are still flabbergasted by how quickly the wheels appear to be falling off of RH . . . ."  And months later, on December 16, 2016, the financial news website The Motley Fool published an article, which stated that RH's "earnings reports have been filled with dubious excuses and self-inflicted errors," and that "CEO Gary Friedman has stretched the limits of credulity with many of his statements over the past year."  The Motley Fool article stated that despite Friedman's previous comments that the Company's earnings were affected by "underperformance in markets affected by energy, oil, or currency fluctuations," a credible analysis of those markets "dispel any notion that low oil or stock prices pressured RH's results," showing that "[t]he lesson for investors" was that "[a]lmost all of Restoration Hardware's attempts to blame results on the macroeconomic environment have been proven false."   The conclusion of the article was damning: "One thing is clear.  Friedman's credibility has been severely damaged by this year's unforced errors and weak excuses."

**THE REASONS WHY THE STATEMENTS WERE IMPROPER**

98.     The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)     the Company's management had poorly planned the launch of RH Modern and had failed to order, "grow," and maintain the necessary inventory to support the launch of the line;

(b)     the Individual Defendants had failed to order RH Modern products in accordance with the Company's stated product lead times;

31

(c)     the Company's ability to introduce new products was compromised by such delays;

(d)     due to the failure to order the necessary inventory and the accompanying delays, the launch and roll-out of RH Modern was not as successful as portrayed;

(e)     RH was forced to spend millions of dollars in "customer experience" initiatives to appease and accommodate unhappy customers who were experiencing delays in the shipment of RH Modern products and/or were threatening to cancel their orders for such product, which led to substantial expenses that drove down the Company's earnings;

(f)     RH's reported inventory levels were due to excess inventory on RH's older, existing product lines, rather than inventory for the in-demand RH Modern products;

(g)     RH's poor financial results in the latter part of FY 2015 and early FY 2016 were largely caused by the disastrous and failed launch of RH Modern, rather than "macro economic challenges," as represented by the Company's management.

(h)     the Company lacked adequate and effective disclosure controls, procedures, and internal control over financial reporting;

(i)     the Company's highly optimistic financial and business prospects were materially false and misleading; and

(j)     based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Relevant Period.

99.     As a result of the Individual Defendants' false and misleading statements and omissions, RH shares traded at artificially inflated prices during the Relevant Period.  Once the true facts regarding the Company's financial condition and growth prospects began to emerge, the Company's stock price fell dramatically, erasing over a billion dollars in market capitalization.

**THE DIRECTOR DEFENDANTS FURTHER VIOLATED SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9, IN FURTHER BREACH OF THEIR FIDUCIARY DUTIES**

100.     The Director Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing RH to issue proxy statements containing materially false and

32

misleading statements.  The Director Defendants' failure to disclose material facts in the proxy statements likewise constitutes a breach of their fiduciary duties.  Plaintiffs expressly disclaim any fraud or intentional wrongdoing as to the proxy statement claims, as the claims are based solely on the Director Defendants' negligent actions.

**Certain Director Defendants Caused RH to Issue the Materially False or Misleading 2015 Proxy Statement**

101.    On May 12, 2015, Defendants Friedman, Alberini, Chaya, Demilio, Mitic, Rowghani, and Schlesinger caused RH to file a proxy statement on Schedule 14A with the SEC (the "2015 Proxy Statement"), in connection with the Company's 2015 Annual Meeting of Stockholders that would be held on June 24, 2015.  In the 2015 Proxy Statement, the foregoing Defendants solicited stockholder votes to re-elect certain "Class III" Directors, including Defendants Friedman and Alberini, and to approve the compensation of the Company's executive officers, among other proposals.

102.    With respect to the proposal to re-elect certain directors, the 2015 Proxy Statement contained the following statements in the section entitled "Board's Role in Risk Oversight":

> Our board of directors is responsible for overseeing our risk management process. Our board of directors focuses on our general risk management strategy, the most significant risks facing us, and oversees the implementation of risk mitigation strategies by management. Our board of directors is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions. In addition, each of the board committees is responsible for the risk management under its area of responsibility and consistent with its charter and such other responsibilities as may be delegated to them by the board of directors from time to time.

103.    The 2015 Proxy Statement also contained a section entitled "Risk Considerations in Our Compensation Program," which provided: "We conducted an assessment of our compensation policies and practices for our employees and concluded that these policies and practices are not reasonably likely to have a material adverse effect on our Company."

104.    The 2015 Proxy Statement went on to describe the specific responsibilities and duties of the Audit Committee of the Board in pertinent part as follows:

33

The audit committee was established for the primary purpose of assisting the board of directors in overseeing the accounting and financial reporting processes of the Company and audits of its financial statements. The audit committee is responsible for, among other matters: (1) appointing, retaining, compensating, evaluating, terminating and overseeing our independent registered public accounting firm; (2) delineating relationships between our independent registered public accounting firm and our Company consistent with the rules of the NYSE and request information from our independent registered public accounting firm and management to determine the presence or absence of a conflict of interest; (3) reviewing with our independent registered public accounting firm the scope and results of their audit; (4) approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm; (5) overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC; (6) reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements; (7) establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters; and (8) reviewing and approving related-person transactions.

Our audit committee consists of Mr. Demilio, Ms. Mitic and Mr. Mottola. Rule 10A-3 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and NYSE rules require us to have at least three audit committee members, all of whom are independent. Our board of directors has affirmatively determined that Mr. Demilio, Ms. Mitic and Mr. Mottola meet the definition of "independent director" for purposes of serving on an audit committee under Rule 10A-3 of the Exchange Act and NYSE rules. In addition, our board of directors has determined that Mr. Demilio qualifies as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K.

105.    The 2015 Proxy Statement further described the specific responsibilities and duties of the Board's Nominating and Corporate Governance Committee in pertinent part as follows:

The nominating and corporate governance committee was established for the primary purpose of assisting the board of directors in discharging its responsibilities relating to the election of directors. The nominating and corporate governance committee is responsible for, among other matters: (1) identifying individuals qualified to become members of our board of directors, consistent with criteria approved by our board of directors; (2) overseeing the organization of our board of directors to discharge the board's duties and responsibilities properly and efficiently; and (3) developing and recommending to our board of directors a set of corporate governance guidelines and principles.

106.    The foregoing statements in the 2015 Proxy Statement conveyed that the Board maintained sufficient and adequate corporate governance, risk management, financial and accounting compliance, and audit oversight programs and procedures.   The 2015 Proxy Statement, however, suggested in a manner that was false and misleading that: (i) the Board was

34

effective in overseeing RH's business affairs; (ii) the Audit Committee (including Defendants Demilio and Mitic) was effective in fulfilling its oversight responsibilities with respect to internal control over financial reporting and disclosure controls and procedures; and (iii) the Nominating and Corporate Governance Committee (including Defendants Demilio and Rowghani) was effective in overseeing and evaluating the Board's conduct, and ensuring that the Board's responsibilities were properly discharged.  In addition, the 2015 Proxy Statement omitted any disclosure reflecting or acknowledging that the Company had failed to order and maintain the adequate inventory to support the launch of RH Modern.

107.    The 2015 Proxy Statement also urged stockholders to approve advisory resolution regarding compensation paid to certain senior executives, including Defendants Friedman, Boone, and Chaya.  In soliciting the approval of the so-called "say-on-pay" compensation proposal, the 2015 Proxy Statement contained a section entitled "Compensation Program and Philosophy," which provided:

> As described in greater detail under the heading "Compensation Discussion and Analysis," our compensation programs are designed to attract and retain the best talent, use the Company's equity to encourage an ownership mentality among our named executive officers and align the long-term financial interest of our executives with those of our Company and our investors. To achieve these objectives, our executive compensation program has three principal components: an annual base salary, a performance based annual cash incentive and a long-term equity incentive compensation. Our Compensation Committee believes that the goals of our executive compensation program are appropriate and that the program is properly structured to achieve those goals.

108.    The 2015 Proxy Statement also contained a "Compensation Discussion and Analysis" section designed to support and justify the "say-on-pay" proposal.  The "Compensation Discussion and Analysis" section stated: "We believe that compensation paid to our named executive officers should be tailored to achieve the key goals of our compensation program and philosophy, namely to attract and retain the best talent and to use the Company's equity to encourage an ownership mentality among our named executive officers by providing them with a long-term stake in the future growth potential of our Company."  The Compensation Discussion and Analysis section further provided an "Overview of Compensation and Philosophy," which noted in pertinent part:

35

Our executive compensation program is specifically designed to:

- attract and retain top-caliber, knowledgeable and experienced senior executives;

- encourage an ownership mentality and align the annual and long-term strategic goals of our executives with those of our Company and our stockholders;

- motivate our executives to achieve superior results for our stockholders;

- reward performance achieved through creativity and capitalizing on unique strategic opportunities and business initiatives;

- encourage risk assessment of business initiatives where we seek return on investment that exceeds downside risks;

- provide reward systems that are easily understood by our managers and stockholders; and

- reinforce the succession planning process to identify and retain next-generation senior leadership to achieve the Company's growth, profitability and other objectives.

109.    The forgoing statements conveyed that RH's compensation system encouraged proper risk management, corporate governance, and alignment of "the long-term financial interest of our executives with those of our Company and our investors."  In reality, the Company's compensation system encouraged – and consistently rewarded – the non-disclosure and inadequate reporting of material information concerning the Company's operations, financial performance, and related business concerns, including the true state of RH Modern's inventory levels and the impact of the product launch on the Company.  The foregoing statements were therefore false and misleading when made.

110.    The 2015 Proxy harmed RH by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the misleading statements in the Proxy, RH's stockholders voted to re-elect Defendants Friedman and Alberini, as well as approved the "say-on-pay" compensation proposal.

**The Director Defendants Caused RH to Issue the Materially False and Misleading 2016 Proxy Statement**

111.    On May 13, 2016, the Director Defendants caused RH to file a proxy statement on Schedule 14A with the SEC (the "2016 Proxy Statement"), in connection with the Company's

36

1   2015 Annual Meeting of Stockholders that would be held on June 22, 2016.  In the 2016 Proxy

2   Statement, the Director Defendants solicited stockholder votes to re-elect the "Class I" Directors,

3   namely Defendants Demilio, Schlesinger, and Chaya, and to approve the compensation of the

4   Company's executive officers, among other proposals

5          112.    With respect to the proposal to re-elect certain directors, the 2016 Proxy

6   Statement contained the following statements in the section entitled "Corporate Governance

7   Guidelines":

8          Our Corporate Governance Guidelines generally specify the distribution of
           rights and responsibilities of our board of directors and detail the rules and
9          procedures for making decisions on corporate affairs. In general, the
           stockholders elect our board of directors, which is responsible for the general
10         governance of our Company, including selection and oversight of key
           management, and management is responsible for running our day-to-day
11         operations.

12         113.    The 2016 Proxy Statement also described the specific responsibilities and duties

13  of the Audit Committee of the Board in pertinent part as follows:

14         The audit committee was established for the primary purpose of assisting the
           board of directors in overseeing the accounting and financial reporting
15         processes of the Company and audits of its financial statements. The audit
           committee is responsible for, among other matters:
16
           •       appointing, retaining, compensating, evaluating, terminating and
17         overseeing our independent registered public accounting firm;

18         •       delineating relationships between our independent registered public
           accounting firm and our Company consistent with the rules of the NYSE and
19         request information from our independent registered public accounting firm and
           management to determine the presence or absence of a conflict of interest;
20
           •       reviewing with our independent registered public accounting firm the
21         scope and results of their audit;

22         •       overseeing the financial reporting process and discussing with
           management and our independent registered public accounting firm the interim
23         and annual financial statements that we file with the SEC;

24         •       reviewing and monitoring our accounting principles, accounting
           policies, financial and accounting controls and compliance with legal and
25         regulatory requirements;

26         •       establishing procedures for the confidential anonymous submission of
           concerns regarding questionable accounting, internal controls or auditing
27         matters; and

28         •       reviewing and approving related-person transactions.

114.    The 2016 Proxy Statement further described the specific responsibilities and duties of the Board's Nominating and Corporate Governance Committee in pertinent part as follows:

> The nominating and corporate governance committee was established for the primary purpose of assisting the board of directors in discharging its responsibilities relating to the election of directors. The nominating and corporate governance committee is responsible for, among other matters:
>
> •    identifying individuals qualified to become members of our board of directors, consistent with criteria approved by our board of directors;
>
> •    overseeing the organization of our board of directors to discharge the board's duties and responsibilities properly and efficiently; and
>
> •    developing and recommending to our board of directors a set of corporate governance guidelines and principles.

115.    The 2016 Proxy Statement went on to describe the "Criteria for Nomination to the Board," as follows:

> In accordance with its charter, the nominating and corporate governance committee will consider candidates submitted by the Company's stockholders, as well as candidates recommended by directors and management, for nomination to our board of directors. The nominating and corporate governance committee considers qualifications for the board of directors membership, which may include, among others: (1) the highest personal and professional integrity, (2) demonstrated exceptional ability and judgment, (3) broad experience in business, finance or administration, (4) familiarity with the Company's industry, (5) ability to serve the long-term interests of the Company's stockholders, (6) sufficient time available to devote to the affairs of the Company, (7) ability to provide continuing service to promote stability and continuity in the boardroom and provide the benefit of familiarity and insight into the Company's affairs that directors would accumulate during their tenure, (8) ability to help the Board work as a collective body and (9) experience, areas of expertise, as well as other factors relative to the overall composition of the Board. The nominating and corporate governance committee further reviews and assesses the activities and associations of each candidate to ensure there is no legal impediment, conflict of interest, or other consideration that might hinder or prevent service on our board of directors. In making its selection, the nominating and corporate governance committee bears in mind that the foremost responsibility of a director of a company is to represent the interests of the stockholders as a whole.
>
> Each director's individual biography set forth above includes the key individual attributes, experience and skills of each director that led to the conclusion that each director should continue to serve as a member of our board of directors at this time, as reflected in the summary above. We believe the range of tenures of our directors creates a synergy between institutional knowledge and new perspectives.

38

116.    The foregoing statements in the 2016 Proxy Statement conveyed that the Board maintained sufficient and adequate corporate governance, risk management, financial compliance, and audit oversight programs and procedures.  The 2016 Proxy Statement, however, suggested in a manner that was false and misleading that: (i) the Board was effective in overseeing RH's business affairs; (ii) the Audit Committee (including Defendants Demilio and Mitic) was effective in fulfilling its oversight responsibilities with respect to internal control over financial reporting and disclosure controls and procedures; and (iii) the Nominating and Corporate Governance Committee (including Defendants Demilio and Rowghani) was effective in overseeing and evaluating the Board's conduct, and ensuring that the Board's responsibilities were properly discharged.  In addition, the 2016 Proxy Statement omitted any disclosure reflecting or acknowledging that the Company had failed to order and maintain the adequate inventory to support the launch of RH Modern.

117.    The 2016 Proxy Statement also urged stockholders to approve advisory resolution regarding compensation paid to certain senior executives, including Defendants Friedman, Boone, and Chaya.  In soliciting the approval of the so-called "say-on-pay" compensation proposal, the 2016 Proxy Statement contained a section entitled "Compensation Program and Philosophy," which provided:

> We are asking our stockholders to approve the say-on-pay proposal as we believe that our compensation programs create the proper incentives for our executive officers. As described in greater detail under the heading "Compensation Discussion and Analysis," our compensation programs are designed to attract and retain the best talent, use the Company's equity to encourage an ownership mentality among our named executive officers and align the long-term financial interest of our executives with those of our Company and our investors. To achieve these objectives, our executive compensation program has three principal components: an annual base salary, a performance-based annual cash incentive and long-term equity incentive compensation.

> In addition, since the date of our last annual meeting, we have engaged in stockholder outreach to solicit input on a variety of matters including our compensation of executive officers from our institutional stockholders as described under "Stockholder Outreach Activities." Based in part on the findings of this outreach effort, we believe our executive officer compensation approach is in line with the expectations of the majority of our institutional stockholders. In addition, in response to the request of our institutional holders, we have adopted certain changes in the presentation of information in this proxy statement concerning the compensation of our executive officers to provide

additional clarity and transparency as to our methodology in determining the compensation of our executive officers and the manner in which we align incentives to performance. We believe that this information, taken together with the basis on which we determine compensation of our executive officers, as described under "Compensation Discussion and Analysis," is consistent with the feedback we have received from our institutional stockholders.

Our compensation committee believes that the goals of our executive compensation program are appropriate and that the program is properly structured to achieve its goals. The board and the compensation committee, which is comprised solely of independent directors, will consider the outcome of this vote when making future executive compensation decisions to the extent appropriate. We intend to present this advisory vote on named executive compensation to our stockholders on an annual basis.

118.    The 2016 Proxy Statement also provided an "Executive Summary" in the section entitled "Compensation Discussion and Analysis," which stated in pertinent part:

We align our executive compensation practices with the ongoing success of our Company. This compensation discussion and analysis ("CD&A") explains the strategy, design, and decision-making processes of our compensation programs and practices in fiscal 2015 for our named executive officers. This CD&A is intended to provide perspective on the compensation information contained in the compensation tables that follow this discussion. This CD&A also discusses how the fiscal 2015 compensation of our named executive officers aligns with the key goals of our compensation philosophy, namely, attracting and retaining the best talent. We also discuss how our Company uses its compensation programs including equity programs to encourage an ownership and stakeholder perspective among our named executive officers by providing them with a long-term interest in the future growth potential of our Company that aligns with the interests of our stockholders.

119.    The CD&A section in the 2016 Proxy Statement further provided:

We believe that compensation paid to our executive officers should be:

•       closely aligned with the performance of the Company, on both a short-term and long-term basis;

•       linked to specific, measurable results intended to create value for stockholders; and

•       tailored to achieve the key goals of our compensation program and philosophy.

•       Our executive compensation programs are aligned with our stockholders' interests, with performance-based compensation being tied primarily to our annual earnings before taxes and our long-term stock price performance.

120.    Also, to garner votes for the "say-on-pay" compensation proposal, the 2016 Proxy Statement featured a section entitled "Fiscal 2015 Business Highlights," which touted the "Financial Performance" and "Key Achievements" that the Company's senior management (including Defendants Friedman, Boone, and Chaya) purportedly accomplished in FY 2015. Among the highlighted "Key Achievements" were the launch of "the new RH Modern brand" and the opening of "its first standalone RH Modern Gallery." But nowhere in this section, or in the entire 2016 Proxy Statement for that matter, was there any acknowledgement or discussion of the Individual Defendants' role in poorly planning the launch of RH Modern and failing to order and maintain the adequate inventory to support the launch of the line.

121.    The forgoing statements conveyed that RH's compensation system encouraged proper risk management, corporate governance, and the alignment of "the long-term financial interest of our executives with those of our Company and our investors." In reality, the Company's compensation system encouraged – and consistently rewarded – the non-disclosure and inadequate reporting of material information concerning the Company's operations, financial performance, and related business concerns, such as RH Modern's inadequate inventory levels and its impact on the launch of the product line. The foregoing statements were therefore false and misleading when made.

122.    The 2016 Proxy Statement harmed RH by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the Individual Defendants' misleading statements in the Proxy Statement, RH's stockholders voted to re-elect Defendants Demilio, Schlesinger, and Chaya, as well as approved the "say-on-pay" compensation proposal.

**INSIDER SELLING**

123.    Not all stockholders were harmed by the Individual Defendants' actions. Indeed, during the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants unloaded their own holdings of RH stock at bloated prices. Specifically, the Insider Selling Defendants (Defendants Boone and Alberini) took advantage of the artificially inflated prices to sell their RH shares for substantial proceeds. As detailed below,

41

these Insider Selling Defendants improperly sold more than $34 million of personally held common stock during the Relevant Period.

124.   Defendant Boone was RH's Chief Financial and Administrative Officer and President during the Relevant Period.  Boone was aware of material, non-public information regarding the inaccuracy of statements made on the Company's behalf in public filings and press releases, and during conference calls and presentations with investors and analysts.  In fact, Boone herself was responsible for making numerous misleading and inaccurate statements to the investing public during the Relevant period.  While in possession of material, non-public information, Boone sold at least 45,000 personally held shares of RH stock at artificially inflated prices for proceeds of approximately $4,470,121.  Boone's sales during the Relevant Period were timed to maximize profits from the Company's then artificially-inflated stock prices, including the following sales:

(a)   On August 25, 2015, Boone sold 5,000 shares of RH stock at approximately $94.77 per share, generating personal proceeds of approximately $472,488;

(b)   On September 17, 2015, Boone sold 20,000 shares of RH stock at approximately $100.00 per share, generating personal proceeds of approximately $2,000,000; and

(c)   On September 25, 2015, Boone sold another 20,000 shares of RH stock at approximately $99.00 per share, generating personal proceeds of approximately $1,997,632.

125.   Defendant Alberini was a member of the Board during the Relevant Period. Alberini was aware of material, non-public information regarding the inaccuracy of statements made on the Company's behalf in public filings and press releases, and during conference calls and presentations with investors and analysts.  While in possession of this material information, Alberini sold at least 311,791 personally held shares of RH stock at artificially inflated prices for proceeds of approximately $29,661,928.  Alberini's sales during the Relevant Period were timed to maximize profits from the Company's then artificially-inflated stock prices, including the following sales:

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

(a)     On April 1, 2015, Alberini sold 20,000 shares of RH stock at approximately $96.10 per share, generating personal proceeds of approximately $1,918,709;

(b)     On April 2, 2015, Alberini sold 20,000 shares of RH stock at approximately $94.78 per share, generating personal proceeds of approximately $1,893,612;

(c)     On April 13, 2015, Alberini sold 20,000 shares of RH stock at approximately $92.85 per share, generating personal proceeds of approximately $1,853,150;

(d)     On April 14, 2015, Alberini sold 20,000 shares of RH stock at approximately $92.81 per share, generating personal proceeds of approximately $1,852,042;

(e)     On April 28, 2015, Alberini sold 20,000 shares of RH stock at approximately $90.345 per share, generating personal proceeds of approximately $1,809,747; and

(f)     On April 29, 2015, Alberini sold 20,000 shares of RH stock at approximately $88.38 per share, generating personal proceeds of approximately $1,764,600.

126.    The foregoing insider sales, which resulted in total proceeds of more than $34 million, are summarized in the following chart.  These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein.

| | Date | Shares Sold | Price | Total |
|---|---|---|---|---|
| **Boone** | 9/25/2015 | 800 | $98.4500 | $78,760.00 |
| | 9/25/2015 | 13922 | $99.9400 | $1,391,364.68 |
| | 9/25/2015 | 682 | $97.2800 | $66,344.96 |
| | 9/25/2015 | 4596 | $100.3400 | $461,162.64 |
| | 9/17/2015 | 20000 | $100.0000 | $2,000,000.00 |
| | 8/25/2015 | 2858 | $94.6900 | $270,624.02 |
| | 8/25/2015 | 300 | $95.6000 | $28,680.00 |
| | 8/25/2015 | 1842 | $94.0200 | $173,184.84 |
| | **TOTAL** | **45,000** | **TOTAL** | **$4,470,121.14** |
| **Alberini** | 10/20/2015 | 700 | $102.0500 | $71,435.00 |
| | 10/20/2015 | 3400 | $100.2100 | $340,714.00 |
| | 10/20/2015 | 900 | $101.2300 | $91,107.00 |
| | 10/6/2015 | 6200 | $93.1800 | $577,716.00 |
| | 10/6/2015 | 3800 | $94.1700 | $357,846.00 |
| | 10/5/2015 | 3000 | $95.5500 | $286,650.00 |
| | 10/5/2015 | 5400 | $93.7300 | $506,142.00 |
| | 10/5/2015 | 1600 | $94.7900 | $151,664.00 |

43

| | | | |
|---|---|---|---|
| 9/22/2015 | 1000 | $99.9800 | $99,980.00 |
| 9/22/2015 | 9000 | $99.0700 | $891,630.00 |
| 9/21/2015 | 400 | $102.0900 | $40,836.00 |
| 9/21/2015 | 5200 | $100.3500 | $521,820.00 |
| 9/21/2015 | 4400 | $101.3500 | $445,940.00 |
| 9/2/2015 | 2200 | $93.0000 | $204,600.00 |
| 9/2/2015 | 7800 | $92.1000 | $718,380.00 |
| 9/1/2015 | 6356 | $91.3600 | $580,684.16 |
| 9/1/2015 | 3644 | $92.1100 | $335,648.84 |
| 8/18/2015 | 9000 | $100.0400 | $900,360.00 |
| 8/18/2015 | 1000 | $100.9200 | $100,920.00 |
| 8/17/2015 | 9000 | $100.8500 | $907,650.00 |
| 8/17/2015 | 1000 | $101.5400 | $101,540.00 |
| 8/7/2015 | 1000 | $101.1100 | $101,110.00 |
| 8/7/2015 | 7300 | $99.2500 | $724,525.00 |
| 8/7/2015 | 1700 | $100.1300 | $170,221.00 |
| 8/6/2015 | 200 | $103.3100 | $20,662.00 |
| 8/6/2015 | 1000 | $101.4100 | $101,410.00 |
| 8/6/2015 | 2200 | $102.3900 | $225,258.00 |
| 8/6/2015 | 6600 | $100.4800 | $663,168.00 |
| 7/24/2015 | 4600 | $104.1400 | $479,044.00 |
| 7/24/2015 | 5400 | $104.9700 | $566,838.00 |
| 7/23/2015 | 9400 | $105.1300 | $988,222.00 |
| 7/23/2015 | 600 | $105.7800 | $63,468.00 |
| 7/8/2015 | 5981 | $97.1400 | $580,994.34 |
| 7/8/2015 | 4019 | $96.5000 | $387,833.50 |
| 7/7/2015 | 200 | $98.7400 | $19,748.00 |
| 7/7/2015 | 3600 | $96.7500 | $348,300.00 |
| 7/7/2015 | 6200 | $97.5700 | $604,934.00 |
| 6/25/2015 | 10000 | $95.8200 | $958,200.00 |
| 6/24/2015 | 10000 | $96.0400 | $960,400.00 |
| 5/15/2015 | 1432 | $89.4700 | $128,121.04 |
| 5/15/2015 | 945 | $88.6000 | $83,727.00 |
| 5/15/2015 | 2659 | $89.4700 | $237,900.73 |
| 5/15/2015 | 1755 | $88.6000 | $155,493.00 |
| 5/14/2015 | 12545 | $88.3400 | $1,108,225.30 |
| 5/14/2015 | 245 | $88.9500 | $21,792.75 |
| 5/14/2015 | 6755 | $88.3400 | $596,736.70 |
| 5/14/2015 | 455 | $88.9500 | $40,472.25 |
| 4/29/2015 | 2188 | $88.7800 | $194,250.64 |
| 4/29/2015 | 4812 | $87.9800 | $423,359.76 |
| 4/29/2015 | 4062 | $88.7800 | $360,624.36 |
| 4/29/2015 | 8938 | $87.9800 | $786,365.24 |

44

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | |
|---|---|---|---|
| 4/28/2015 | 3965 | $89.9800 | $356,770.70 |
| 4/28/2015 | 4865 | $90.7100 | $441,304.15 |
| 4/28/2015 | 2135 | $89.9800 | $192,107.30 |
| 4/28/2015 | 9035 | $90.7100 | $819,564.85 |
| 4/14/2015 | 35 | $93.0200 | $3,255.70 |
| 4/14/2015 | 6965 | $92.6000 | $644,959.00 |
| 4/14/2015 | 65 | $93.0200 | $6,046.30 |
| 4/14/2015 | 12935 | $92.6000 | $1,197,781.00 |
| 4/13/2015 | 11505 | $92.6000 | $1,065,363.00 |
| 4/13/2015 | 805 | $93.1000 | $74,945.50 |
| 4/13/2015 | 6195 | $92.6000 | $573,657.00 |
| 4/13/2015 | 1495 | $93.1000 | $139,184.50 |
| 4/2/2015 | 2258 | $95.0600 | $214,645.48 |
| 4/2/2015 | 4742 | $94.5000 | $448,119.00 |
| 4/2/2015 | 4192 | $95.0600 | $398,491.52 |
| 4/2/2015 | 8808 | $94.5000 | $832,356.00 |
| 4/1/2015 | 2348 | $95.2200 | $223,576.56 |
| 4/1/2015 | 6885 | $96.1300 | $661,855.05 |
| 4/1/2015 | 4360 | $95.2200 | $415,159.20 |
| 4/1/2015 | 945 | $96.9500 | $91,617.75 |
| 4/1/2015 | 3707 | $96.1300 | $356,353.91 |
| 4/1/2015 | 1755 | $96.9500 | $170,147.25 |
| **TOTAL** | **311,791** | **TOTAL** | **$29,661,928.33** |
| **Grand Total** | **356,791** | | **$34,132,049.47** |

## THE SECURITIES CLASS ACTION

127.    As a result of the conduct alleged herein, the Company (as well as individuals Friedman and Boone) were named as defendants in the Securities Class Action, which alleges violations of Sections 10(b) and 20(a) of the Exchange Act.

128.    Specifically, the Securities Class Action alleges that certain officers of the Company, including Friedman and Boone, knew about the RH Modern inventory shortage, the Company's failure to order RH products in accordance with lead time requirements, and widespread customer complaints and order cancellations, but continued to make promising statements on behalf of the Company.  Both before and after the launch of RH Modern, Friedman and Boone were kept apprised of the Company's RH Modern inventory shortage and customer backlogs, complaints, and accommodations.

129.    The Securities Class Action further relies on testimony from former Company insiders confirming that Boone and Friedman received "weekly inventory reports," which detailed RH's inventory levels and showed that the Company did not have enough RH Modern products in stock.  Multiple insiders confirmed Friedman's hands-on style of management, including that he had the final word on how much RH Modern products would be ordered and that he was effectively "hands on everything."  Another former Company insider reported that products in the RH Modern Source Book were photoshopped or digitally manipulated and did not even exist.  Moreover, the Securities Class Action alleges that the Company's "CW" software, which permitted all employees to see immediately what was in stock and the extent of backorders.

130.    Based on the strength of these allegations, on February 26, 2018, Judge Rogers issued an order in the Securities Class Action, denying defendants' motion to dismiss in its entirety and holding that plaintiffs in that case had satisfied the heightened pleading standards of Fed. R. Civ. Proc. 9(b), and the Private Securities Litigation Reform Act ("PLSRA").

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

131.    By reason of their positions as officers, directors, and/or fiduciaries of RH and because of their ability to control the business and corporate affairs of RH, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage RH in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of RH and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

132.    Each Director and Officer of the Company owes to RH and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

133.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the

Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

134. In addition to the foregoing duties, the members of the Audit Committee (Defendants Demilio and Mitic) owed specific duties to RH under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

135. According to RH's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board "in overseeing the accounting and financial reporting processes of the Company and audits of the financial statements of the Company and for the purposes set forth in the listing requirements of the New York Stock Exchange (the "NYSE")." The Audit Committee is also responsible for reviewing "the policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with generally accepted accounting principles ("GAAP"), the NYSE, and the applicable rules and regulations of the Securities and Exchange Commission (the "SEC")." According to the Audit Committee Charter, the Audit Committee was tasked with specific responsibilities and duties relating to "*Documents/Reports/Accounting Information Review*," as follows:

> 1. Review this Charter periodically, and no less frequently than annually, and recommend to the Board any necessary amendments as conditions dictate.
>
> 2. Review and discuss with management and the independent registered public accounting firm the Company's annual financial statements, including the Management's Discussion and Analysis proposed to be included in the Company's Annual Report on Form 10-K, quarterly financial statements, and all internal controls reports (or summaries thereof), if any, and recommend to the Board, if appropriate, that the audited financial statements be included in the Company's Annual Report on Form 10-K for filing with the SEC. To the extent practical and appropriate, review other relevant reports or financial information submitted by the Company to any governmental body, or the public, including management certifications as required by the Sarbanes-Oxley Act of 2002 (Sections 302 and 906), and any relevant reports rendered by the independent registered public accounting firm (or summaries thereof). Review and discuss with management and the independent registered public accounting firm all significant deficiencies and material weaknesses in the design or

47

operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

3.      Review with management and the independent registered public accounting firm each Quarterly Report on Form 10-Q prior to its filing.

4.      Discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

5.      Have one or more members of the Committee, in particular, if reasonably available, the Chair of the Committee, review, before release, the unaudited operating results in the Company's quarterly earnings release and/or discuss the contents of the Company's quarterly earnings release with management.

6.      Have one or more members of the Committee, in particular, if reasonably available, the Chair of the Committee, review, before release, any non-GAAP or "pro forma" financial information, guidance or revised guidance to be included in a press release of the Company.

7.      To the extent practical and appropriate, review the regular internal reports (or summaries thereof) to management prepared by the internal auditing department and management's response.

136.    Also, as set forth in the Audit Committee Charter, the Audit Committee was required to carry out specific responsibilities and duties concerning "*Financial Reporting Processes and Accounting Policies*," as follows:

13.     In consultation with the independent registered public accounting firm and the internal auditors, review the integrity of the organization's financial reporting processes (both internal and external), and the internal control structure (including disclosure controls).

14.     Review with management the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

15.     Review all related party transactions as defined in the NYSE requirements (consistent with the Company's Related Party Transaction Policies and Procedures as approved by the Board of Directors).

16.     Establish and maintain procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting, or auditing matters.

17.     Establish and maintain procedures for the confidential, anonymous submission by Company employees regarding questionable accounting or auditing matters.

137.    The Audit Committee was also tasked with specific "*Internal Audit*" responsibilities including reviewing and discussing with management: "(i) the appointment and replacement of the person assigned to oversee the internal audit department, (ii) the scope and responsibilities of the internal audit department, and (iii) any significant reports to management prepared by the internal audit department."

138.    Furthermore, the Audit Charter mandated that the Audit Committee carry out "*Other Responsibilities*," including the following:

19.    Review with the independent registered public accounting firm, the internal auditing department and management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented. (This review should be conducted at an appropriate time subsequent to implementation of changes or improvements, as decided by the Committee.)

20.    Prepare the report that the SEC requires be included in the Company's annual proxy statement.

21.    To the extent appropriate or necessary, review the rationale for employing audit firms other than the principal independent registered public accounting firm and, where an additional audit firm has been employed, review the coordination of audit efforts to assure completeness of coverage, reduction of redundant efforts and the effective use of audit resources.

22.    Establish, review and update periodically a code of ethics and ensure that management has established a system to enforce this code. It shall be the policy of the Committee that the code is in compliance with all applicable rules and regulations. Review management's monitoring of the Company's compliance with the organization's code of ethics.

23.    Annually review and assess the Committee's performance.

24.    Report regularly to the Board.

25.    Perform any other activities consistent with this Charter, the Company's Bylaws, as may be amended from time to time, and governing law, as the Committee or the Board deems necessary or appropriate.

139.    Upon information and belief, RH maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Compensation Committee Duties**

140.    Also, the members of RH's Compensation Committee (Defendants Demilio and Schlesinger) owed specific duties relating to the compensation of the Company's directors and

executive officers, including, among other things, reviewing and approving compensation for the Board and management, evaluating the Company's performance in setting compensation, advising the Board at large of the Company's compensation policies and the risks thereof, and reviewing and authorizing compensation-related information for reporting purposes and disclosure in SEC filings.

141.    According to the Compensation Committee Charter, the Compensation Committee was tasked with the following specific duties and responsibilities:

1.    Annually review and approve the Company's corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of such goals and objectives, and, either as a Committee or together with the other independent directors of the Board (as directed by the Board),determine and approve the CEO's compensation level based on this evaluation, to the extent not otherwise determined by an existing employment agreement or arrangement approved by the Board and/or the Committee. In determining the long-term incentive component of the CEO's compensation, the Committee will consider the Company's performance and relative stockholder return, the value of similar incentive awards to CEOs at comparable companies, and the awards given to the Company's CEO in past years.

2.    Annually review and, if appropriate, approve (or make recommendations to the Board regarding approval of) the following with respect to the Company's executive officers: a) annual base salary levels; b) annual incentive compensation levels; c) long-term incentive compensation levels; and d) any supplemental or special benefits.

3.    Review and, when and if appropriate, approve (or make recommendations to the Board regarding approval of) executive officers' employment agreements, severance agreements, and change of control agreements/provisions, in each case prior to the Company's entering into such agreements/provisions.

4.    Annually review and make recommendations to the Board with respect to non-CEO compensation, incentive compensation plans and equity-based plans.

5.    Administer the Company's incentive compensation plans and equity-based plans as in effect and as adopted from time to time by the Board, to the extent such administration is not delegated, in whole or in part, to any secondary committee, including any committee of the Board, to the extent permissible under applicable law, or otherwise retained by the Board.

6.    Approve any new equity compensation plan or any material change to an existing plan where stockholder approval has not been obtained.

7.    Review and approve any stock option award or any other type of award as may be required for complying with any tax, securities, or other regulatory (including NYSE) requirement, or otherwise determined to be appropriate or desirable by the Committee or the Board.

8.    Ensure appropriate overall corporate performance measures and goals linked to compensation are set and determine the extent that established goals have been achieved and any related compensation earned.

9.      Review and discuss with the Company's management the "Compensation Discussion and Analysis" required to be included in the Company's annual proxy statement or annual report on Form 10-K filed with the Securities and Exchange Commission (the "SEC"), and recommend to the Board whether or not to include such "Compensation Discussion and Analysis" in such proxy statement or annual report.

10.     Advise the Board regarding risks to the Company of its compensation policies and practices and the disclosure of any such risks as required by SEC rules in the Company's proxy statement.

11.     Perform such other functions and have such other powers consistent with this Charter, the Bylaws and governing law as the Committee or the Board may deem appropriate.

12.     Produce a Committee report on executive compensation as required to be included in the Company's annual proxy statement, annual report on Form 10-K or other filing required to be made with the SEC.

142.    Upon information and belief, RH maintained a Compensation Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Compensation Committee as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct**

143.    Additionally, the Individual Defendants, as officers and/or directors of RH, are bound by the Company's Code of Business Conduct (the "Code"), which includes guidelines developed "around the recognition that everything we do in connection with our work should be measured against the highest possible standards of ethical business conduct," among other things. RH's employees, officers and directors were required to follow the Code. The Code was designed to promote the following business practices and conduct:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in the reports and documents the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;

- compliance with applicable governmental laws, rules and regulations;

- the prompt internal reporting to the appropriate person of violations of this Code; and accountability for adherence to this Code.

144.   The Code contained a specific "Conflicts of Interest" provision, which provided the following:

> A conflict of interest arises any time the personal interests of Company Associates interfere with his, her or their ability to act in the best interests of the Company. All Company Associates must discharge their responsibilities on the basis of what is in the best interest of the Company independent of personal considerations or relationships. Company Associates must disclose any potential conflicts of interest to either the Chief Compliance Officer or Corporate Compliance Officer or such officer's designees, who can advise the Company Associate as to whether or not the Company believes a conflict of interest exists.

> Conflicts of interest may not always be clear-cut, so Company Associates are encouraged to bring questions about particular situations to the Corporate Compliance Officer or such officer's designees. Company Associates should also disclose potential conflicts of interest involving the Company Associate's spouse, siblings, parents, in-laws, children, life partner and members of the Company Associate's household.

> Conflicts of interest involving any member of the Board of Directors shall be addressed (i) by the Board of Directors or applicable committee thereof in accordance with policies and procedures followed by the Board of Directors from time to time, and (ii) in a manner that is consistent with the discharge by the members of the Board of Directors of their fiduciary duties.

145.   The Code further imposed specific responsibilities and duties relating to the "Accuracy of Reports, Records and Accounts," as follows:

> All Company Associates are responsible for the accuracy of their respective records, time sheets and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations and to compete effectively. The records and books of account of the Company shall meet the highest standards and accurately reflect the true nature of the transactions they record.

> Business transactions must be properly authorized and completely and accurately recorded on the Company's books and records in accordance with generally accepted accounting principles and established Company financial policy. Company Associates must not create false or misleading documents or accounting, financial or electronic records for any purpose, and no one may direct Company Associates to do so. For example, expense reports must accurately document expenses actually incurred in accordance with Company policies.

> No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason. No disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation or for any purpose other than as described in the documents. All Company Associates shall comply with generally accepted accounting principles and the Company's internal controls at all times. Company records shall be retained or

52

disposed of in accordance with applicable legal and regulatory requirements. Company Associates must be aware of and are encouraged to follow the policies and procedures, in effect from time to time, governing retention, storage, retrieval and handling of the Company's documents and records.

146. The Code also contained a strict insider trading policy, pursuant to which the Individual Defendants were bound, as follows:

INSIDER TRADING; COMMUNICATIONS WITH THIRD PARTIES

Company Associates who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business. To assist in complying with this policy, the Company has adopted an Insider Trading Policy and Guidelines for Material Non-Public Information.

Insider Trading

Inside information is material information about a publicly traded company that is not known by the public. Information is deemed "material" if it could affect the market price of a security or if a reasonable investor would attach importance to the information in deciding whether to buy, sell or hold a security. Inside information typically relates to financial conditions, such as progress toward achieving revenue and earnings targets or projections of future earnings or losses of the Company. Inside information also includes changes in strategy regarding a proposed merger, acquisition or tender offer, new products or services, contract awards and other similar information. Inside information is not limited to information about the Company. It also includes material non-public information about others, including the Company's customers, suppliers, and competitors.

Insider trading is prohibited by law. It occurs when an individual with material, non-public information trades securities or communicates such information to others who trade. The person who trades or "tips" information violates the law if he or she has a duty or relationship of trust and confidence not to use the information.

Trading or helping others trade while aware of inside information has serious legal consequences, even if the insider does not receive any personal financial benefit. Insiders may also have an obligation to take appropriate steps to prevent insider trading by others.

Company Associates are expected to be aware of, and to act in accordance with the Company's Insider Trading Policy and Guidelines for Material Non-Public Information.

147. Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants as those set forth above.

53

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

**Duties Pursuant to the Company's Code of Ethics for Chief Executive Officer and Senior Financial Officers**

148.    Furthermore, certain of the Individual Defendants, specifically Defendants Friedman and Boone, as the Company's CEO and Chief Financial and Administrative Officer, respectively, are bound by the Company's Code of Ethics for Chief Executive Officer and Senior Financial Officers ("Code of Ethics for Senior Officers").  According to the Code of Ethics for Senior Officers, "[t]he Chief Executive Officer and Senior Financial Officers hold important roles in corporate governance," and "are vested with both the responsibility and authority to protect, balance, and preserve the interests of all of the Company's stakeholders, including stockholders, customers, employees, suppliers, and citizens of the communities in which business is conducted."  To carry out this critical function, the Code of Ethics for Senior Officers imposed the following responsibilities and duties:

**1.    Honest and Ethical Conduct.**  The Chief Executive and Senior Financial Officers will exhibit and promote the highest standards of honest and ethical conduct. They shall:

- Conduct Company business in an ethical, moral and legal manner.

- Encourage and reward professional integrity in all aspects of the organization, including by eliminating inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal, or alienation.

- Seek to avoid, eliminate and/or prevent the appearance or occurrence of conflicts of interest between what is in the best interest of the Company and what could result in material personal gain for a member of the organization, including the Chief Executive and Senior Financial Officers.

- Work together and with others in the Company in order to provide a mechanism for members of the organization to inform senior management of deviations in practice from policies and procedures governing honest and ethical behavior.

- Demonstrate their personal support for honest and ethical conduct through periodic communication throughout the organization regarding the importance of such conduct to the Company.

**2.    Records and Reports.**  The Chief Executive and Senior Financial Officers will manage the Company's transaction and reporting systems and procedures, records and public disclosures in order that:

- Business transactions are properly authorized and completely and accurately recorded on the Company's books and records in accordance with

54

1    generally accepted accounting principles and established Company financial policy.

2

3    •    The Company's records are retained or disposed of in accordance with applicable legal and regulatory requirements.

4    •    Reports, documents and other public communications made by the Company are delivered in a timely, fair, complete, accurate and understandable manner.

5

6    **3.    Compliance with Applicable Laws, Rules and Regulations**.  The Chief Executive and Senior Financial Officers will establish and maintain mechanisms to:

7

8    •    Monitor and promote compliance with applicable governmental laws, rules and regulations.

9

10   •    Identify, report to the Chief Executive Officer, Chief Financial Officer or members of the Audit Committee of the Company, and correct in a swift and certain manner, any detected deviations from applicable governmental laws, rules and regulations, or this Code of Ethics.

11

12   •    Hold the appropriate individuals accountable for deviations from applicable governmental laws, rules and regulations, or this Code of Ethics, and make such individuals subject to disciplinary action, up to and including termination of employment with the Company.

13

14

15       149.    Upon information and belief, the Company maintained a version of the Code

16   during the Relevant Period that imposed the same, or substantially and materially the same or

17   similar, duties on, among others, Defendants Friedman and Boone, as those set forth above.

18   **Control, Access, and Authority**

19       150.    The Individual Defendants, because of their positions of control and authority as

20   directors and/or officers of RH, were able to and did, directly and/or indirectly, exercise control

21   over the wrongful acts complained of herein, as well as the contents of the various public

22   statements issued by RH.

23       151.    Because of their advisory, executive, managerial, and directorial positions with

24   RH, each of the Individual Defendants had access to adverse, non-public information about the

25   financial condition, operations, and improper representations of RH.

26       152.    At all times relevant hereto, each of the Individual Defendants was the agent of

27   each of the other Individual Defendants and of RH, and was at all times acting within the course

28   and scope of such agency.

**Reasonable and Prudent Supervision**

153.     To discharge their duties, the officers and directors of RH were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of RH were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how RH conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that RH was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

154.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to RH and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of RH, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of RH, the absence of good faith on their part, and a reckless disregard for their duties to RH and its shareholders that the Individual Defendants were aware, or should

1   have been aware, posed a risk of serious injury to RH.  The conduct of the Individual Defendants

2   who were also officers and/or directors of the Company have been ratified by the remaining

3   Director Defendants who collectively comprised RH's Board.

4        155.   The Individual Defendants each breached their duties of loyalty and good faith

5   by allowing defendants to cause, or by themselves causing, the Company to make false and/or

6   misleading statements that misled shareholders into believing that disclosures related to the

7   Company's financial and business prospects were truthful and accurate when made.

8        156.   In addition, as a result of the Individual Defendants' illegal actions and course of

9   conduct, the Company is now the subject of the Securities Class Action that alleges violations of

10   the federal securities laws.  As a result, RH has expended, and will continue to expend, significant

11   sums of money to rectify the Individual Defendants' wrongdoing.

12   **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

13        157.   In committing the wrongful acts alleged herein, the Individual Defendants have

14   pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

15   and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants

16   further aided and abetted and/or assisted each other in breaching their respective duties.

17        158.   During all times relevant hereto, the Individual Defendants collectively and

18   individually initiated a course of conduct that was designed to mislead shareholders into believing

19   that the Company's business and financial prospects were better than they actually were.  In

20   furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively

21   and individually took the actions set forth herein.

22        159.   The purpose and effect of the Individual Defendants' conspiracy, common

23   enterprise, and/or common course of conduct was, among other things, to: (a) disguise the

24   Individual Defendants' violations of law, including breaches of fiduciary duties, unjust

25   enrichment, corporate waste, and insider selling; and (b) disguise and misrepresent the

26   Company's actual business and financial prospects.

27        160.   The Individual Defendants accomplished their conspiracy, common enterprise,

28   and/or common course of conduct by causing the Company to purposefully, recklessly, or

1  negligently release improper statements.  Because the actions described herein occurred under the

2  authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial

3  participant in the conspiracy, common enterprise, and/or common course of conduct complained

4  of herein.

5  161.  Each of the Individual Defendants aided and abetted, and rendered substantial

6  assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

7  commissions of the wrongdoing complained of herein, each Individual Defendant acted with

8  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

9  wrongdoing, and was aware of his or her overall contribution to and furtherance of the

10  wrongdoing.

11  **DAMAGES TO RH**

12  162.  As a result of the Individual Defendants' wrongful conduct, RH disseminated

13  false and misleading statements and omitted material information to make such statements not

14  false and misleading when made.  The improper statements have devastated RH's credibility.  RH

15  has been, and will continue to be, severely damaged and injured by the Individual Defendants'

16  misconduct.

17  163.  As a direct and proximate result of the Individual Defendants' actions as alleged

18  above, RH's market capitalization has been substantially damaged, having lost hundreds of

19  millions of dollars in value as a result of the conduct described herein.

20  164.  Further, as a direct and proximate result of the Individual Defendants' conduct,

21  RH has expended, and will continue to expend, significant sums of money.  Such expenditures

22  include, but are not limited to:

23  (a)  costs incurred in investigating and defending RH and certain of its officers in the

24  pending Securities Class Action, plus potentially millions of dollars in settlement or to

25  satisfy an adverse judgment;

26  (b)  costs incurred from compensation and benefits paid to the Individual Defendants,

27  which compensation was based at least in part on RH's artificially-inflated stock price;

28  and

1       (c)     costs incurred from the loss of the Company's customers' confidence in RH's

2    products and services.

3       165.    Moreover, the foregoing acts of corporate malfeasance have irreparably damaged

4 RH's corporate image and goodwill.  For at least the foreseeable future, RH will suffer from what

5 is known as the "liar's discount," a term applied to the stocks of companies who have been

6 implicated in illegal behavior and have misled the investing public, such that RH's ability to raise

7 equity capital or debt on favorable terms in the future is now impaired.

8             **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

9       166.    Plaintiffs bring this action derivatively in the right and for the benefit of RH to

10 redress injuries suffered, and to be suffered, by RH as a direct result of the Individual Defendants'

11 breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling, as well as

12 the aiding and abetting thereof, by the Individual Defendants.  RH is named as a nominal

13 defendant solely in a derivative capacity.

14       167.    Plaintiffs will adequately and fairly represent the interests of RH in enforcing and

15 prosecuting its rights.

16       168.    Plaintiffs were shareholders of RH common stock at the time of the wrongdoing

17 of which Plaintiffs complain, and has been continuously since.

18       169.    Plaintiffs did not make a pre-suit demand on the Board to pursue this action

19 because such a demand would have been a futile and wasteful act.

20       170.    At the time this action was commenced, the Board of RH was comprised of the

21 following nine (9) directors: Defendants Friedman, Alberini, Belling, Chaya, Demilio, Mitic,

22 Rowghani, and Schlesinger, and Non-Party Director Krane.  A majority of these directors are not

23 disinterested and independent with respect to the acts and omissions alleged herein.  Notably,

24 more than half of the current board faces a substantial likelihood of personal liability for their

25 breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry,

26 supervision, and due care described herein.  Where plaintiffs allege that at least half of the

27 members of the current board are not independent or disinterested, demand is excused as futile.

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

171.    Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand is Futile as to the Director Defendants Because They Face a Substantial Likelihood of Liability**

172.    Director Defendants Friedman, Alberini, Belling, Chaya, Demilio, Mitic, Rowghani, and Schlesinger face a substantial likelihood of liability for their individual misconduct.  As alleged above, each of these Director Defendants violated Section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2015 Proxy Statement and/or 2016 Proxy Statement, which were filed with the SEC, in connection with the solicitation of stockholder votes.[1]   Demand is therefore excused because an overwhelming majority of the Board faces a substantial likelihood of liability for violations of the federal securities law.

173.    Defendants Friedman, Alberini, Chaya, Demilio, Mitic, Rowghani, and Schlesinger also breached their fiduciary duties of loyalty and good faith by causing or allowing improper statements to be made in the Company's press releases, SEC filings, investor conference calls, and presentations during the Relevant Period.  As members of the Board, these Defendants had a fiduciary duty to ensure that the Company's public statements and SEC filings were complete, accurate, and true.  By authorizing the false and misleading statements alleged herein during the Relevant Period, and by failing to correct the false and misleading statements made by Defendants Friedman, Boone and other RH officers during such time, these Defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to a lawsuit asserting violations of the federal securities laws.  A director's breach of the duty of candor is not entitled to protection under the business judgment rule.  As a result, any demand upon Defendants Friedman, Alberini, Chaya, Demilio, Mitic, Rowghani, and Schlesinger

---

[1]   Defendant Belling faces a substantial likelihood for misconduct relating to the negligent issuance of materially misleading written statements in the 2016 Proxy Statement, but not for the 2015 Proxy Statement.

to bring suit against themselves, or against the executive management of the Company, would be a useless and futile act.

174.    Moreover, Defendants Friedman, Alberini, Chaya, Demilio, Mitic, Rowghani, and Schlesinger, as directors (and, in some cases, also as Audit Committee members), owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's disclosure controls and procedures and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

175.    Director Defendants Friedman, Alberini, Belling, Chaya, Demilio, Mitic, Rowghani, and Schlesinger also wasted corporate assets by paying improper and excessive compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

176.    The Director Defendants' making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control, constitute breaches of fiduciary duties, for which they each face a substantial likelihood of liability.  If Friedman, Alberini, Belling, Chaya, Demilio, Mitic, Rowghani, and Schlesinger were to bring a suit on behalf of RH to recover damages sustained as a result of this misconduct,

1  they would expose themselves to significant liability.  This is something they will not do.  For

2  this reason, demand is futile.

3  **Demand is Futile as to the Audit Committee Defendants for Additional Reasons**

4        177.   Pursuant to the Audit Committee's charter, Audit Committee Defendants Demilio

5  and Mitic were responsible for, among other things, overseeing RH's accounting and financial

6  reporting processes, reviewing and approving the Company's quarterly and annual financial

7  statements and earnings press releases, and overseeing the Company's internal controls over

8  financial reporting, and discharging their other duties described herein.  Despite these specific

9  duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or

10  failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination

11  of false and/or materially misleading financial statements, earnings press releases and guidance,

12  and failed in their specific duties to ensure that the Company's internal controls over financial

13  reporting were sufficient and that statements made by the Company regarding its business and

14  financial prospects were accurate.  Accordingly, the Audit Committee Defendants face a

15  sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and

16  good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

17  **Demand is Futile as to Defendants Demilio and Schlesinger for Additional Reasons**

18        178.   Pursuant to the Compensation Committee Charter, Compensation Committee

19  Members Demilio and Schlesinger were responsible for, among other things, reviewing and

20  approving compensation for the RH Board and management, evaluating the Company's

21  performance and setting appropriate compensation based on overall corporate performance

22  measures, advising the Board of the risks of the Company's compensation policies, and reviewing

23  and discussing with the Company's management the compensation-related disclosures to be

24  included in the Company's SEC filings, including its annual reports and proxy statements.

25        179.   Specifically, with respect to the 2015 and 2016 Proxy Statements, Demilio and

26  Schlesinger were responsible for reviewing and authorizing the statements and information

27  contained therein concerning various compensation-related matters, including, among other

28  things, the "say-on-pay" compensation proposals, "Risk Considerations in Our Compensation

1  Program," "Compensation Discussion and Analysis," "Compensation Program and Philosophy,"

2  and Fiscal Business Highlights.

3      180.    Despite their specific duties and obligations as Compensation Committee

4  Members, Defendants Demilio and Schlesinger issued or caused to be issued materially

5  misleading written statements concerning those compensation-related issues, which were

6  contained in the 2015 and 2016 Proxy Statements.  Accordingly, Demilio and Schlesinger face a

7  sufficiently substantial likelihood of liability for their violations of Section 14(a) of the Exchange

8  Act and the breach of their fiduciary duties of loyalty and good faith.  Any demand upon Demilio

9  and Schlesinger therefore is futile.

10  **Demand is Futile as to Defendants Friedman and Chaya For Additional Reasons**

11      181.    Demand is futile as to Defendants Friedman and Chaya, as RH admits that

12  Friedman and Chaya do not meet the standards for director independence, given their status as

13  current employees of the Company.  Friedman currently serves as RH's CEO, and Chaya

14  currently serves as the Company's Co-President and Chief Creative Officer, and as such, they

15  both receive substantial compensation from the Company for their respective executive roles.  For

16  example, Friedman received $1,682,921.00 in total compensation (including salary, bonus, stock

17  awards, option awards and other compensation) from RH in 2016, while Chaya received

18  $4,516,550 in total compensation from RH in 2016.  Accordingly, Friedman and Chaya are not

19  independent nor disinterested because they each have financially benefited from their own

20  wrongdoing and the wrongdoing of other Individual Defendants, and because they each continue

21  to depend on compensation from RH to support their livelihood.

22      182.    Demand is also futile as to Defendant Friedman because it is not possible for him

23  to impartially demand that the Company brings the claims asserted herein.  Friedman is a named

24  defendant in the Securities Class Action, which alleges that he made many of the misstatements

25  described above in violation of the federal securities laws.  Notably, on February 26, 2018,

26  Judge Rogers issued an order in the Securities Class Action (the "February 26, 2018 Order"),

27  holding that the federal securities fraud allegations could proceed against both RH and members

28  of the Company's senior management, including Friedman.  Judge Rogers singled out Friedman,

along with Defendant Boone, and found that Friedman was responsible for making many of the statements alleged to be false and misleading, and that he acted with scienter. *See* February 26, 2018 Order at 14 ("The Court finds that plaintiffs have sufficiently alleged material falsity with regard to the challenged market performance statements because Friedman's rosy representations concealed that RH Modern was suffering from a severe lack inventory and defendants were receiving customer complaints and canceled orders regarding the same."). If Friedman is ultimately found liable in the Securities Class Action, then RH will be held liable for securities fraud under theories of respondent superior and Section 20A of the Securities Exchange Act of 1934.

183. Accordingly, if Friedman were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action. This he will not do.

184. Moreover, liability in the Securities Class Action raises the risk that Friedman could be barred by the SEC from serving as an officer or director at any publicly-traded company, further endangering Friedman's livelihood.

185. Based on the foregoing grounds, demand would be futile as to both Defendants Friedman and Chaya.

**Demand is Futile to Defendant Alberini Based on Insider Selling**

186. Demand is futile as to Defendant Alberini because, as alleged herein, Alberini engaged in insider trading activity at a time when he knew of adverse, material, non-public information about the Company's business condition and financial outlook that was not being disclosed to stockholders.

187. On the basis of this non-public information, Defendant Alberini timed his sales of RH stock to maximize profit from the Company's then artificially inflated share price. As a result of his illicit insider sales, Alberini received direct financial benefits not shared with RH shareholders, and is, therefore, directly interested in a pre-suit demand. In fact, while in possession of material, non-public information, Alberini sold at least 311,791 personally held shares of RH stock at artificially inflated prices for proceeds of approximately $29,661,928.

Furthermore, Alberini is interested in a demand because he faces a substantial likelihood of liability for breaches of fiduciary duties of loyalty and good faith based on his challenged insider sales.  As such, demand upon Alberini is futile.

**Demand is Futile as to Defendant Belling for Additional Reasons**

188.    Demand is also futile as to Defendant Belling because, as stated in the Proxy Statement filed with the SEC on June 27, 2017, the Company has admitted that Belling does not meet the standards of director independence.  Belling is neither independent nor disinterested because prior to his appointment to the RH Board in April 2016, Belling performed advisory services to the Company and received compensation from the Company in that advisory capacity, separate and apart from any director compensation he may have received.  Demand is therefore futile as to Belling.

**Demand is Futile as to All Directors for Additional Reasons**

189.    The current Board of RH has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite ongoing misconduct by the Company's executive officers, including Defendants Friedman and Boone, who still respectively serve as RH's CEO and Chief Financial and Administrative Officer, the Board has taken no action to address the harm this misconduct has caused to the Company.

190.    Moreover, each of the current Directors receives annual cash compensation, as well as awards of RH stock, purely for serving as Board member.  This compensation provides a substantial stipend to these directors, from which each of them personally benefits and depends on for his or her livelihood.  The total compensation to these Directors in the form of retainer fees, stock awards and other compensation for 2015, 2016 and 2017 was as follows:

| Name | Demilio | Belling | Alberini | Krane | Mitic | Rowghani | Schlesinger | Chaya |
|---|---|---|---|---|---|---|---|---|
| 2017 | $366,965.00 | $271,965.00 | $271,965.00 | 296,965.00 | $296,965.00 | $286,965.00 | $306,965.00 | $1,227,359.00 |
| 2016 | $351,986.00 | $265,170.00 | $243,159.00 | $224,469.00 | $286,670.00 | $243,920.00 | $301,670.00 | $4,516,550.00 |
| 2015 | $332,063.00 |  |  |  | $282,063.00 | $277,063.00 | $297,063.00 | $2,061,269.00 |
| **Total** | **$1,051,014.00** | **$537,135.00** | **$515,124.00** | **$521,434.00** | **$865,698.00** | **$807,948.00** | **$905,698.00** | **$7,805,178.00** |

191.    Finally, a pre-suit demand on each of the Directors is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action

65

1   that would threaten the economic benefits they receive as members of RH's Board.  If RH's

2   current officers and directors are protected against personal liability for their breaches of fiduciary

3   duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"),

4   they caused the Company to purchase that insurance for their protection with corporate funds,

5   i.e., monies belonging to the shareholders.  However, Plaintiffs are informed and believe that the

6   D&O Insurance policies covering the Individual Defendants in this case contain provisions that

7   eliminate coverage for any action brought directly by RH against the Individual Defendants,

8   known as the "insured versus insured exclusion."

9       192.    As a result, if the members of RH's Board were to sue themselves or certain

10   officers of RH, there would be no D&O Insurance protection, and thus, this is a further reason

11   why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this

12   action is brought, such insurance coverage exists and will provide a basis for the Company to

13   effectuate recovery.  Therefore, the members of the Board cannot be expected to file the claims

14   asserted in this derivative lawsuit because such claims would not be covered under the Company's

15   D&O Insurance policy.

16       193.    Under the factual circumstances described herein, the Individual Defendants are

17   more interested in protecting themselves than they are in protecting RH by prosecuting this action.

18   Therefore, demand on RH and its Board is futile and is excused.

19       194.    RH has been, and will continue to be, exposed to significant losses due to the

20   Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits

21   against themselves or others who were responsible for the wrongful conduct.  Thus, the Director

22   Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial

23   likelihood of liability for their breaches, rendering any demand upon them futile.

24       195.    Plaintiffs have not made any demand on shareholders of RH to institute this action

25   since such demand would be a futile and useless act for the following reasons:

26       (a)    RH is a publicly traded company with thousands of shareholders of record and at

27           least hundreds of thousands of beneficial owners;

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

(b)     making demand on such a number of shareholders would be impossible for Plaintiffs, who have no means of collecting the names, addresses, or phone numbers of RH shareholders; and

(c)     making demand on all shareholders would force Plaintiffs to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

**COUNT I**

**Against the Director Defendants for Violations of Section 14(a) of the Exchange Act**

196.    Plaintiffs hereby incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

197.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

198.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."

199.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

67

200.     The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2015 and 2016 Proxy Statements.  The 2015 and 2016 Proxy Statements contained proposals, *inter alia*, to RH's stockholders urging them to re-elect certain directors to the Board and to approve the compensation of the Company's executive officers.  The 2015 and 2016 Proxy Statements, however, misstated or failed to disclose, *inter alia*: (i) the Board's failure to fulfill its oversight responsibilities with respect to the Company's disclosure controls and procedures and internal control over financial reporting; (ii) the Company's failure to order and maintain adequate inventory for RH Modern and the poorly-planned, disastrous launch of the product line; (iii) the adequate and defective reporting procedures that led to the dissemination of misleading material information concerning those business concerns; and (iv) the Board-approved compensation programs that encouraged the non-disclosure and inadequate reporting of material information.

201.     By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of the Director Defendants' wrongful conduct, RH misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding RH's recommendation to re-elect certain directors to the Board and approve certain executive compensation.

202.     The misleading information contained in the 2015 and 2016 Proxy Statements was material to RH's stockholders in determining whether to elect certain directors to the Board and approve certain executive compensation.  This information was also material to the integrity of those directors that were proposed for election to the Board.

203.     Plaintiffs, on behalf of RH, thereby seek relief for damages inflicted upon the Company based upon the misleading Proxy Statements.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

204.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

205.    The Individual Defendants owed and continue to owe RH fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe RH the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

206.    As set forth herein, the Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.  The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, RH has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208.    Plaintiffs, on behalf of RH, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

209.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

210.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of RH.

211.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to RH.

212.    Plaintiffs, as shareholders and representatives of RH, seek restitution from Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

213.    Plaintiffs, on behalf of RH, have no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Waste of Corporate Assets**

214.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

215.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

216.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

217.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

218.    Plaintiffs, on behalf of RH, have no adequate remedy at law.

**COUNT V**

**Against the Insider Selling Defendants Boone and Alberini for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**

219.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

220.    At the time the Insider Selling Defendants sold their RH stock, they knew the information described above, and sold RH stock on the basis of such information.

221.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold RH stock.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   222.   The Insider Selling Defendants' sales of stock while in possession and control of

2   this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and

3   good faith.

4   223.   Since the use of the Company's proprietary information for their own gain

5   constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled

6   to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained

7   thereby.

8   224.   Plaintiffs, on behalf of RH, have no adequate remedy at law.

9   **PRAYER FOR RELIEF**

10   WHEREFORE, Plaintiffs demand judgment as follows:

11   A.   Against all of the Individual Defendants for the amount of damages sustained by

12   the Company as a result of the Individual Defendants' violations of federal law, breaches

13   of fiduciary duties, unjust enrichment, waste of corporate assets, and insider selling;

14   B.   Directing RH to take all necessary actions to reform and improve its corporate

15   governance and internal procedures to comply with applicable laws and to protect RH

16   and its shareholders from a repeat of the damaging events described herein, including

17   but not limited to putting forward for shareholder vote resolutions for amendments to the

18   Company's By-Laws or Articles of Incorporation, and taking such other action as may

19   be necessary to place before shareholders for a vote the following corporate governance

20   proposals or policies:

21   •   a proposal to strengthen the Board's supervision of operations and

22   compliance with applicable state and federal laws and regulations;

23   •   a proposal to strengthen the Company's internal reporting and financial

24   disclosure controls to ensure material information is adequately and timely

25   disclosed to the SEC and the public;

26   •   a proposal to develop and implement procedures for greater shareholder

27   input into the policies and guidelines of the Board;

28

- a proposal to ensure the accuracy of the qualifications of RH's directors, executives and other employees;

- a proposal to de-classify the Board and calling for each director to stand for election to the Board annually;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of RH to nominate at least three candidates for election to the Board to replace existing directors;

- a proposal to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.    Awarding to RH restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1

## JURY DEMAND

2          Plaintiffs demand a trial by jury.

3    Dated: August 24, 2018                    JOHNSON FISTEL, LLP
                                               FRANK J. JOHNSON (SBN 174882)
4                                              PHONG L. TRAN (SBN 204961)

5                                        By:   _s/ Frank J. Johnson_
                                               FRANK J. JOHNSON
6
                                               655 West Broadway, Suite 1400
7                                              San Diego, CA 92101
                                               Telephone: (619) 230-0063
8                                              Facsimile: (619) 255-1856
                                               frankj@johnsonfistel.com
9                                              phongt@johnsonfistel.com

10                                             *Lead Counsel and Counsel for Plaintiffs*

11                                             THE WEISER LAW FIRM, P.C.
                                               ROBERT B. WEISER
12                                             BRETT D. STECKER
                                               JAMES M. FICARO
13                                             22 Cassatt Avenue
14                                             Berwyn, PA 19312
                                               Telephone: (610) 225-2677
15                                             Facsimile: (610) 408-8062
                                               rw@weiserlawfirm.com
16                                             bds@weiserlawfirm.com
                                               jmf@weiserlawfirm.com
17
18                                             RM LAW, P.C.
                                               RICHARD A. MANISKAS
19                                             1055 Westlakes Dr., Ste. 3112
                                               Berwyn, PA 19312
20                                             Telephone: (484) 324-6800

21                                             *Additional Counsel for Hosrof Izmirliyan*

22

23

24

25

26

27

28

73

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

DocuSign Envelope ID: D7181748-B9C8-4865-BB58-1EBE1440DFC2

# <u>VERIFICATION</u>

I, David Magnani, verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: August 22, 2018

DocuSigned by:

*David Magnani*

(Signature of David Magnani)

## **RH VERIFICATION**

I, Hosrof Izmirliyan, hereby verify that I am familiar with the allegations in the Amended Consolidated Complaint, and that I have authorized the filing of the Amended Consolidated Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date:  August 22, 2018                    _hosrof_

_____

Hosrof Izmirliyan